*458
Per Curiam.

Dublin’s first contention is that its purchase of the note and mortgage from MIF Realty L.P. was an arm’s-length transaction which established the best evidence of true value for the property. Dublin further contends that the BTA mischaracterized the transaction and misconstrued R.C. 5713.03 by not accepting the purchase of the note and mortgage as a sale that established value. We disagree.
Despite Dublin’s claims to the contrary, two separate and distinct transactions resulted in Dublin’s acquisition of the real property. In the transaction between Dublin and MIF Realty L.P., Dublin purchased only the Indian Run note and mortgage and associated documents. The transaction between MIF Realty L.P. and Dublin did not transfer the fee simple title to any tract, lot, or parcel of real property. Admittedly, at the time of the purchase of the note and mortgage by Dublin, the mortgage had been declared to be a first priority in the pending foreclosure, and the judgment for the unpaid balance of the note provided Dublin with a credit towards the purchase price that could be used in bidding at the sheriff’s sale. Realistically, however, someone other than Dublin could have made the highest bid at the sheriffs sale and received fee simple title to the property. Dublin did not receive fee simple title until it received the sheriffs deed.
Likewise, R.C. 5713.03 is not applicable to the transaction between Dublin and MIF Realty L.P. R.C. 5713.03 provides that if a “tract, lot, or parcel has been the subject of an arm’s length sale between a willing seller and willing buyer within a reasonable length of time * * *, the auditor shall consider the sale price * * * to be the true value for taxation purposes.” As we have just decided, there was no sale of a “tract, lot, or parcel” until Dublin received the sheriffs deed for the property.
Moreover, the price that Dublin paid at the sheriffs sale is not a relevant consideration in establishing true value. R.C. 5713.04 prevents the price paid at the sheriffs sale from establishing the best evidence of true value, stating that “[t]he price for which such real property would sell at auction or forced sale shall not be taken as the criterion of its value.”
Dublin’s second contention is that the real property should be valued at its actual occupancy rate on the tax lien date, rather than at an assumed stabilized occupancy rate, which would not be achieved until sometime in the future. We agree.
Swift’s appraisal presented to the BOR and Pickering’s appraisal made deductions to compensate for the fact that, on the lien date, the project was a new multiunit project in the rent-up phase which had not achieved a stabilized occupancy rate. Dublin contended that, until the project achieved a stabilized *459 occupancy rate, it should deduct the present value of the yearly shortfalls, calculated as the difference between the actual net income and the projected net income at the stabilized occupancy rate.
In practical terms, Dublin argues that, while a new multiunit project may be worth a certain amount once it reaches a stabilized occupancy, it is worth some lesser amount when it is new and essentially empty.
Dublin cites Ohio Adm.Code 5705-3-03(B) as authority for the concept that its property should be valued based on its occupancy rate on the tax lien date, rather than at its ultimate stabilized occupancy rate. Ohio Adm.Code 5705-3-03(B) provides that “[e]ach lot, tract, or parcel of land, and all buddings, structures, fixtures, and improvements to land shall be appraised by the county auditor according to true value and money, as it or they existed on tax lien date of the year in which the property is appraised.” (Emphasis added.)
On the other hand, the appellees contend that in this case the occupancy of the project was a function of the business practices of past management and should not be a factor in the valuation for tax purposes.
In State ex rel Park Invest. Co. v. Bd. of Tax Appeals (1964), 175 Ohio St. 410, 412, 25 O.O.2d 432, 434,195 N.E.2d 908, 910, we stated that when an actual sale is not available “an appraisal becomes necessary. It is in this appraisal that the various methods of evaluation, such as income yield or reproduction cost, come into action. Yet, no matter what method of evaluation is used, the ultimate result of such an appraisal must be to determine the amount which such property should bring if sold on the open market.” Because no arm’s-length sale occurred in this case the only evidence upon which the BTA could base its decision was the appraisals presented to it by Dublin. However, the BTA rejected the proposition contained in the appraisals presented by Dublin that it was entitled to a reduction in value during the rent-up period. The BTA stated that there was no theoretical support in either the testimony or Dublin’s brief that would justify the deduction, nor was it aware of any appraisal theory supporting this deduction.
Pickering provided the theory for such a deduction when he stated in his appraisal report that “[i]n instances where there is a time lag between the valuation date and the point in time when the property is projected to reach its ‘stabilized’ operating level, a discounting process is necessary to account for the difference between the actual net income and the stabilized net income during the rent-up period.” Support for Pickering’s concept can be found in The Appraisal of Real Estate, American Institute of Real Estate Appraisers (11 Ed. 1996) 590, which states that “[t]he appraiser should account for the impact of the rent lost while the building is moving towards stabilized occupancy.” Likewise in Wallery, Assessing Congregate Care Facilities: A Unique Problem in Valuation, Journal of Property Tax Management (Fall 1991) 11, 13, the author states that congre *460 gate care centers often “take five years or more to be absorbed into the market.” As a result of the long absorption period the author states that “[a] prudent purchaser would likely require a discount from the construction cost because lease-up or sellout is uncertain * * *.” Id. at 18.
The ultimate result of an appraisal is to determine the amount that the property would bring if sold on the open market on the tax lien date. It must be evaluated as it existed on that lien date. The BTA acted unreasonably and unlawfully in refusing to consider a reduction in valuation for a new multiunit property that was essentially empty on tax lien day. As pointed out in The Appraisal of Real Estate, at 590, several ways exist to estimate the amount of the deduction that should be taken to reach the true value of a new project prior to rent up. Upon remand, the BTA must evaluate Dublin’s evidence to determine whether the appraisal methods and factual evidence presented by Dublin’s appraisers were proper and sufficient to prove the amount of the deduction.
In its third proposition of law, Dublin contends that the BTA erred in not considering the Pickering appraisal because he failed to separate real estate income from service income. We disagree.
The property being valued is a congregate care center that comprises a combination of real estate and business activities. Dublin charges for such services as food and housekeeping; these are business activities. It also charges rental for the apartments; that is a real estate activity. Each activity has separate expenses. In a valuation of only the real estate, the two activities must be kept separate. The separation of the income and expenses is important not only when determining net income, but also when considering a comparison of the sale prices of comparable facilities. See Wallery at 19. While this separation may be difficult, Pickering made no effort to do so.
Dublin presents two arguments to justify Pickering’s failure to separate the income and expenses for the two activities. First, it contends that this separation was not always possible. Second, it contends that inclusion of the business net income will result in a value equal to or greater than a value based on the real estate net income alone.
The answer that it is difficult to accurately separate the income and expenses between business and real estate activities is not a sufficient reason not to separate them; it must be done, because we tax real estate in this case.
Moreover, while the use of net income figures that include both the business and the real estate net income may result in a value which equals or exceeds the value determined on the basis of the real estate net income alone, such procedure would not be proper. We are valuing real estate; the addition or subtraction of business income and expenses may distort the valuation of the real estate, and such income and expenses must be deleted.
*461 Dublin contends that by leaving the auditor’s valuation intact, the BTA adopted a valuation that exceeds Dublin’s valuation that includes both the business and real estate values. Thus, Dublin argues that no value could be approved by the BTA that was higher than Dublin’s value. We disagree.
First, as explained above, a valuation which includes business income and expenses is not acceptable for real estate valuation purposes. Second, the burden at the BTA was on Dublin to prove its right to the reduction in value it sought. Zindle v. Summit Cty. Bd. of Revision (1989), 44 Ohio St.3d 202, 203, 542 N.E.2d 650, 651. However the BTA found that Dublin’s evidence was not competent and probative and that Dublin did not meet its burden to establish a value other than that set by the auditor. The BTA may approve a board of revision value if the appellant does not prove a right to a reduction in value. Westlake Med. Investors, L.P. v. Cuyahoga Cty. Bd. of Revision (1996), 74 Ohio St.3d 547, 549, 660 N.E.2d 467, 468.
Dublin’s last contention is that it was unreasonable and unlawful for the BTA to ignore the Swift appraisal. We agree.
R.C. 5715.08 provides that the county board of revision “shall take full minutes of all evidence given before the board” and the secretary of the board “shall preserve * * * records of all minutes and documentary evidence offered on each complaint.” R.C. 5717.01 provides upon the filing of an appeal to the BTA, the board of revision “shall thereupon certify to the board of tax appeals a transcript of the record of the proceedings of the county board of revision pertaining to the original complaint, and all evidence offered in connection therewith.” R.C. 5715.19(G) provides that “[a] complainant shall provide to the board of revision all information or evidence within his knowledge or possession that affects the real property that is the subject of his complaint. A complainant who fails to provide such information or evidence is precluded from introducing it on appeal to the board of tax appeals or the court of common pleas, except that the board of tax appeals or court may admit and consider the evidence if the complainant shows good cause * * *.” Finally, R.C. 5717.04 requires that when an appeal is filed with this court from the BTA, the BTA is to file “a certified transcript of the record of the proceedings of the board pertaining to the decision complained of and the evidence considered by the board in making such decision.”
A review of the foregoing statutes shows a comprehensive procedure for preserving evidence and presenting it to the BTA. In fact, the evidence contained in the record to the BTA from the board of revision may be used as the sole basis for deciding the appeal. R.C. 5717.01 permits the BTA to “order the appeal to be heard on the record and the evidence certified to it by the county board of revision.”
*462 The statutory transcript that was sent from the BOR to the BTA in this case contained the written appraisal report and the taped, but untranscribed, testimony of appraiser Wayne Swift. Swift’s appraisal report and testimony became part of the evidence Dublin presented to the BTA to support its position.
In its brief to the BTA, Dublin reviewed the Swift appraisal for the BTA’s consideration. In fact, Dublin spent more space in its brief to the BTA discussing the Swift appraisal than it did the Pickering appraisal. However, a review of the BTA’s opinion fails to disclose any recognition or consideration by it of the Swift appraisal. In Ridgeview Ctr., Inc. v. Lorain Cty. Bd. of Revision (1989), 42 Ohio St.3d 30, 536 N.E.2d 1157, 1158, we quoted the BTA’s opinion in the Ridgeview case as stating, “ ‘This board should and has considered the administrative record (statutory transcript) which the county board of revision is required to file with this Board, giving the record whatever weight this board deems appropriate, even though additional evidence may be and in this case was accepted.’ ” The BTA should have followed the procedure it outlined in Ridge-view and given the record that same consideration in this case. However, we do not know what the BTA thought of the Swift appraisal because its decision.is silent on the subject.
If the BTA considered, but did not accept, Swift’s appraisal, it should have set forth that fact in its decision, along with its reasons for not accepting the appraisal. In Howard v. Cuyahoga Cty. Bd. of Revision (1988), 37 Ohio St.3d 195, 197, 524 N.E.2d 887, 889, we stated, “This court is unable to perform its appellate duty when it does not know which facts the BTA selected in rendering its decision. We now require it to state what evidence it considered relevant in reaching its value determinations.” Before we can rule on the BTA's decision concerning Swift’s appraisal, the BTA must set forth its determination thereon. On remand, the BTA must analyze the Swift appraisal and set forth its reasons for accepting or rejecting it.
Therefore, the decision of the BTA is reversed, and the cause is remanded for reconsideration in conformity with this opinion.

Decision reversed and cause remanded.

Moyer, C.J., F.E. Sweeney, Pfeifer and Lundberg Stratton, JJ., concur.
Douglas, Resnick and Cook, JJ., dissent.