HIGBEE COMPANY, APPELLEE AND CROSS-APPELLANT; CITY OF STRONGSVILLE ET AL., APPELLANTS AND CROSS-APPELLEES, *v.* CUYAHOGA COUNTY BOARD OF REVISION ET AL., APPELLEES.

[Cite as *Higbee Co. v. Cuyahoga Cty. Bd. of Revision,*
107 Ohio St.3d 325, 2006-Ohio-2.]

(No. 2004–0052—Submitted November 9, 2005—Decided January 4, 2006.)

## Per Curiam.

{¶ 1} This case concerns the valuation of a 15.046–acre tract of real property owned by the Higbee Company ("Higbee"), a subsidiary of Dillard's, Inc. ("Dillard's"). The property, which is located in the SouthPark Center in Strongsville, is improved with a two-story, 213,084–square–foot building housing a Dillard's department store. Higbee paid $10 for the 15.046 acres of land. The building was built by CDI Contractors, Inc., a wholly owned subsidiary of Dillard's, for a cost of $14,927,945. It is not clear whether the CDI costs include soft costs, such as architect's fees and insurance. The Dillard's store is one of four anchor stores attached to the SouthPark Center shopping mall. The other anchor stores are J.C. Penney, Kaufmann's, and Sears. Construction of the Dillard's store began in 1995 and was completed in 1996, with the store opening for business in November 1996.

{¶ 2} For tax year 1997, the auditor valued the property at $17,036,714. Higbee filed a real-property-valuation complaint with the Cuyahoga County Board of Revision in which it originally contended that the property had a fair market value of $6,400,000. Later, Higbee amended that valuation to $6,860,250. A countercomplaint filed by the Strongsville Board of Education and the city of Strongsville contended that the value should be that set by the auditor. After a hearing, the board of revision made no change in value.

{¶ 3} Higbee filed a notice of appeal with the Board of Tax Appeals ("BTA") to contest the board of revision's valuation. At a hearing held by the BTA, Higbee presented the testimony and valuation of two appraisers: Alvin Benton, who valued the property at $9,600,000, and Maxwell Ramsland Jr., who valued the property at $10,500,000.

{¶ 4} In opposition to Higbee's appraisals, the city of Strongsville and the Strongsville Board of Education offered the appraisal of Dean T. Smith, who valued the property at $22,000,000.

{¶ 5} After the hearing but before the BTA resolved the appeal, this court decided *Cleveland Elec. Illum. Co. v. Lake Cty. Bd. of Revision,* 96 Ohio St.3d 165, 2002-Ohio-4033, 772 N.E.2d 1160, which requires that appeals, like Higbee's, that had not been properly certified by the board of revision be remanded for proper certification. In response to that decision, the BTA remanded the case, the board of revision properly certified its order, and a new appeal was filed by

Higbee. In addition, the city of Strongsville and the Strongsville Board of Education also filed notices of appeal with the BTA.

{¶ 6} The BTA decided the appeals filed after the remand based on the record already made by the parties. The BTA accepted the cost-based appraisal valuation offered by Higbee's appraiser, Ramsland. The valuation accepted by the BTA was based on a valuation of $4,250,000 for the land and $10,695,000 for the building. The building valuation accepted by the BTA was based upon Ramsland's replacement value of $15,975,000, less $534,573 for physical depreciation and $5,500,000 for external obsolescence, plus $751,688 for site improvements. The BTA rounded the resulting building value to $10,695,000, resulting in a total valuation for land and building of $14,945,000. The BTA denied Higbee's claim for functional obsolescence, which would have further reduced the building valuation by an amount of $3,445,000.

{¶ 7} Higbee filed a motion with the BTA for reconsideration of the BTA's rejection of its claim of functional obsolescence and for a recalculation of external obsolescence. The BTA denied Higbee's motion for reconsideration.

{¶ 8} The city of Strongsville and the Strongsville Board of Education (collectively, "Strongsville") filed a notice of appeal of the BTA's decision with this court. Higbee filed a notice of cross-appeal.

{¶ 9} These appeals are now before the court as appeals as of right.

{¶ 10} Strongsville's first contention is that the BTA erred in refusing to allow its counsel to question a witness about or see certain papers the witness took to the stand. This situation arose when Higbee called Dick Curry, the director of property taxes for Dillard's, as a rebuttal witness. Apparently, Curry took some papers with him when he went to the witness stand. Most of Curry's direct testimony related to facts concerning sales and rents at Dillard's stores in Ohio and elsewhere. At the end of Curry's direct testimony, counsel for Strongsville asked if he could approach the witness to see what he was testifying from. Curry apparently gave the documents he had to counsel for Strongsville, because at one point Curry said he did not know the answer to a question asked by Strongsville's counsel and said he would have to look at his data, at which point counsel for Strongsville responded: "Is that something I have?" Curry responded, "If I could, let me see that. I might be able to come up with that number." Counsel for Strongsville said, "Here's everything that you gave me." Later, counsel for Strongsville asked that the papers be marked as exhibits. When certain pages of the papers were marked for purposes of identification as exhibits 12, 13, 14, and 16, Higbee's counsel objected to further review of those pages on the grounds that they were part of a document protected by attorney-client privilege and as work product. Counsel for Higbee described the document as one that was prepared by him to discuss with Curry as potential testimony in this case and was

marked with a legend stating that it was protected by attorney-client privilege and the attorney-work-product doctrine. The attorney-examiner ruled that the papers were work product and that counsel for Strongsville could not examine them. The exhibits were sealed and kept with the file.

{¶ 11} When he was asked which of the papers he relied on when testifying, Curry replied that he "looked through that one for the square footage, but [he] couldn't find the store. That's all [he] looked for." Later, counsel for Higbee's clarified that the document Curry looked at was exhibit 19. In its decision concerning these papers, the BTA stated that "[i]t appears from the record that the documents in question were not relied upon by the witness during his examination."

{¶ 12} While the Rules of Evidence are not applicable to the BTA, we have held that the rules "may guide the BTA in conducting its hearings." *Orange City School Dist. Bd. of Edn. v. Cuyahoga Cty. Bd. of Revision* (1996), 74 Ohio St.3d 415, 417, 659 N.E.2d 1223. As authority for its contention that it should be permitted to inspect the sealed documents, Strongsville refers us to Evid.R. 612, which provides that "if a witness uses a writing to refresh his memory for the purpose of testifying, either: (1) while testifying; or (2) before testifying, if the court in its discretion determines it is necessary in the interests of justice, an adverse party is entitled to have the writing produced at the hearing. He is also entitled to inspect it, to cross-examine the witness thereon, and to introduce in evidence those portions which relate to the testimony of the witness."

{¶ 13} We find that the underlying premise of Evid.R. 612 is not applicable to the facts of this case, because the BTA found that the documents in question were not relied upon by the witness during his examination. Therefore, the BTA correctly denied Strongsville access to exhibits 12, 13, 14, and 16.

{¶ 14} Strongsville's second contention is that the BTA erred in refusing to admit into evidence certain exhibits offered by it. Specifically, Strongsville contends that the BTA erred in failing to admit its exhibits 10 through 19 into evidence.

{¶ 15} Exhibit 10, along with exhibits 11, 15, 17, and 18, was included in the papers that Curry took to the stand with him. On cross-examination at his deposition, Curry identified exhibit 10 as a form he had prepared using a program on Dillard's computer system. The form, which is entitled "SouthPark Mall Cost Approach," shows a calculation for economic obsolescence based on the cost approach.

{¶ 16} Exhibit 11 is a depreciation calculation for short- and long-lived items at SouthPark. Curry testified that this also was calculated by a software program at Dillard's.

{¶ 17} Exhibit 15 is a page from an unidentified publication that Curry recognized but could not recall the name of, which listed information for the Western Hills Plaza and the Western Woods Mall, both of which are located in the Cincinnati area. Someone—Curry did not know who—had made notes on the exhibit. Exhibit 17 is an exhibit prepared by Curry that shows a four-year sales history for Dillard's SouthPark store and uses the sales for the year 2000 to calculate an "indicated total value." Exhibit 18 is another internally prepared document that itemizes the costs of the SouthPark building for a total of $69.72 per square foot. Finally, exhibit 19 is a multiple-page document with the heading "Dillard Covenants and Expiration Dates," which lists Dillard's stores, indicating which are owned by Dillard's and which are leased and the lease-expiration date, but no lease amounts are shown. The only numerical data set forth in exhibit 19 is the square footage of each store.

{¶ 18} Strongsville cites no authority as to why these documents should have been admitted into evidence. While these documents were apparently taken to the stand by Curry, he looked at none of them, with the exception of exhibit 19. Curry admitted that he referred to exhibit 19 in an attempt to answer a question posed by Strongsville's counsel, but could not find the answer. Exhibit 19 has little of possible relevance to a valuation of the SouthPark store.

{¶ 19} This court has stated that the BTA "has discretion in admitting evidence, weighing it, and granting credibility to testimony." *Westhaven, Inc. v. Wood Cty. Bd. of Revision* (1998), 81 Ohio St.3d 67, 69–70, 689 N.E.2d 38. The BTA did not abuse its discretion in not admitting these exhibits into evidence.

{¶ 20} Strongsville next contends that the BTA should not have admitted into evidence Higbee's exhibits C, D, I, J, L, M, N, P, and Q.

{¶ 21} Exhibit C was identified by Ramsland, one of Higbee's appraisers, as a copy of a letter from the Cuyahoga County Board of Revision to Dillard's, informing it of a reduction in value for tax year 2000 for property apparently located in the Beachwood school district. The property at issue is not located in the Beachwood school district.

{¶ 22} Exhibit D was identified by Ramsland as page 448 from The Appraisal of Real Estate (Appraisal Institute, 12th Ed.2001). On that page under the heading "Further Reading," the reader is referred to two sources, one of which, concerning regression analysis, was written by Ramsland.

{¶ 23} Exhibit I is an article entitled "Market–Supported Adjustments Using Multiple Regression Analysis." On cross-examination, the article was shown to Dean Smith, Strongsville's appraiser, who agreed that it was a copy of the article by Ramsland that was referred to in Exhibit D.

{¶ 24} Exhibit J is a copy of an article written by several persons, including Benton, one of Higbee's appraisers, from a 1996 issue of The Assessment Journal concerning the use of regression analysis to assess anchor department stores. The article was shown to Smith on cross-examination. Smith stated that he was not familiar with the article.

{¶ 25} Exhibit L is a series of pages from the 1997 Directory of Major Malls with information on numerous shopping-center malls. On cross-examination, Smith was asked a question concerning the Western Hills Mall and the Western Woods Mall, both of which have Cincinnati addresses and both of which are listed on these pages.

{¶ 26} Exhibit M is a copy of a real-property-conveyance fee statement dated September 1998 for parcel No. 550–0132–0003–00 for $8,083,832, the grantor being Western Woods Mall, Inc. Smith said that it looked similar to the one he had relied on.

{¶ 27} Exhibit N is also a copy of a real-property-conveyance fee statement, dated January 1998, for parcel No. 550–0132–0003–00. The grantee was Western Woods Mall, Inc., Agent, and the price for the property was $3,800,000. Smith said that he did not recognize this as the same property whose later transfer was reflected in exhibit M.

{¶ 28} Exhibit P is a page from the 2000 Directory of Major Malls that lists information for a mall in Bethesda, Maryland. Smith recognized it as such; however, he stated that he did not consider the publication in his analysis.

{¶ 29} Exhibit Q is a page from the publication Dollar & Cents of Shopping Centers. Smith had never seen the page shown to him, but he was familiar with the publication and recognized its layout.

{¶ 30} Strongsville states that the BTA "presumably took into account numerous Exhibits which were improper and as counsel for the property owner asserted, all went to impeach the credibility of the report of Mr. Dean Smith." While some of these exhibits were perhaps questionably admitted into evidence, there is nothing in the BTA's decision to indicate that they were given any weight. If there was any error by the BTA in admitting these exhibits, it was harmless error.

{¶ 31} Strongsville's next contention is that the BTA committed error in accepting the testimony and appraisals of Higbee's two appraisers in evidence. Strongsville contends that the two appraisers did not have knowledge of the real estate market in the relevant area. Although Higbee's two appraisers did not seem to have as thorough a knowledge of the Cleveland area as Strongsville's appraiser, any lack of knowledge of specific details of the local surroundings by Higbee's appraisers goes to the weight of their testimony and does not disqualify

their testimony. This court has consistently held that the BTA is vested with wide discretion in determining the weight to be given to the evidence and credibility of witnesses that come before the board. *Cardinal Fed. S. & L. Assn. v. Cuyahoga Cty. Bd. of Revision* (1975), 44 Ohio St.2d 13, 73 O.O.2d 83, 336 N.E.2d 433, paragraph three of the syllabus. The BTA has the discretion to accept all, part, or none of the testimony of any appraiser. Absent a showing of an abuse of discretion, this court will not reverse the BTA's determination as to the credibility of witnesses. *Witt Co. v. Hamilton Cty. Bd. of Revision* (1991), 61 Ohio St.3d 155, 157, 573 N.E.2d 661. There has been no showing that the BTA abused its discretion in permitting Higbee's appraisers to testify.

{¶ 32} Strongsville's next contention is that the BTA erred by accepting a valuation based on the current business use of the property, rather than a valuation based on value-in-exchange. As stated in its brief, Strongsville's real contention here is that by accepting the deduction for external obsolescence calculated by Higbee's appraiser, Ramsland, the BTA accepted a valuation based on value-in-use rather than value-in-exchange. Strongsville also contends that the BTA erred in accepting a business valuation based on sales per square foot, as opposed to a real-estate-valuation opinion. The essence of both these contentions is that when the BTA permitted Ramsland to deduct for external obsolescence, it permitted sales per square foot to determine the real-property valuation, rather than real-property factors. We agree.

{¶ 33} In its determination of value, the BTA accepted Ramsland's deduction of $5,500,000 for depreciation in the form of external obsolescence. The Appraisal of Real Estate (12th Ed.2001) 395–396, recognizes three types of depreciation: (1) physical deterioration, (2) functional obsolescence, and (3) external obsolescence. External obsolescence attempts to adjust for a loss in real-property value caused by factors outside the property. Id. at 412. The Appraisal of Real Estate states, "External obsolescence may be caused by economic or locational factors. It may be temporary or permanent, but it is not usually considered curable on the part of the owner, landlord, or tenant." Id. The text further states that "[e]xternal obsolescence usually carries a marketwide effect and influences a whole class of properties, rather than just a single property." Id. One example of external obsolescence used in The Appraisal of Real Estate is that of an apartment project located downwind of a new asphalt plant. The value of that property is reduced by the external factor of the asphalt plant. Id. at 413.

{¶ 34} Three methods are set forth in The Appraisal of Real Estate for calculating external obsolescence: (1) allocation of market-extracted depreciation, (2) market data analysis, and (3) capitalization of income loss. Id. Ramsland used the capitalization of income loss as one of his methods of calculating external

obsolescence. In addition, he used another method, which is not recognized in The Appraisal of Real Estate.

{¶ 35} Concerning the method of capitalization of income loss to calculate obsolescence, The Appraisal of Real Estate states that "[w]hen a property produces income, the income loss caused by the external obsolescence can be capitalized into an estimate of the loss in total property value." Id.

{¶ 36} The first method for calculating external obsolescence used by Ramsland was to capitalize his calculated rental deficiency. Even though the property is owner-occupied and does not produce income, Ramsland calculated a rental deficiency. To calculate his rental deficiency, Ramsland first calculated the rental amount he estimated that an investor would require as a return on this property. He next subtracted from his estimate of the required rental amount the rental amount he thought the property would generate. The difference between these two amounts yielded his rental deficiency.

{¶ 37} To calculate the rental amount that he thought the SouthPark store would generate, Ramsland used the rental amount that he determined in his income approach to value. Ramsland's rental income for his income approach was based on sales per square foot because, as he stated, "appraisers who work in the area of anchor department stores, understand fully the relationship between the productivity of the store, meaning the sales per foot and the rental. That's the way the department store rental market works." Further on, Ramsland again stated that "department store rentals are based on a base rent and productivity." After reviewing Ramsland's income approach to value, wherein he calculated his rental amount, the BTA found that it was unable to accept that value, stating:

{¶ 38} "Upon review, we are unable to give weight to Higbee's income approach values. Initially, we are unable to conclude that the leased properties used to develop a market rent are indeed comparable to the subject property. The vast majority of properties used by both appraisers [Benton and Ramsland] do not include rents for properties containing gross leaseable space approximating the subject's square footage. Most properties come from states other than Ohio and do not appear to be in areas comparable to the subject's location. Some properties are anchors in malls that are substantially different from the South Park Mall, especially in terms of size. Although Mr. Ramsland relied mostly upon five leases he considered to be the most comparable to the subject, there are still differences in size and market. We are especially concerned about the comparability of markets given that percentage rent is a factor included in income. We also have concerns about the capitalization rates used by the appraisers. Both appraisers utilized the market extraction method for determin-

ing capitalization rates. We are unable to find that the sales used are comparable for application to the subject's market."

{¶ 39} At another point in its discussion of the capitalization rate Ramsland used for calculating value under the income method, the BTA stated that it was "reluctant to rely upon the rate." However, the BTA, in footnote seven to its decision and order, acknowledged that the same figure was used in Ramsland's calculation of external obsolescence, but stated that "[g]iven that he also utilized two other methods to determine obsolescence, we do not find his reliance upon this rate to be detrimental to his obsolescence conclusion."

{¶ 40} In addition to the reasons stated by the BTA for rejecting Ramsland's rental and capitalization amounts, we also find that those amounts are objectionable for use in calculating external obsolescence for another reason. In *Ridgeview Ctr., Inc. v. Lorain Cty. Bd. of Revision* (1989), 42 Ohio St.3d 30, 31, 536 N.E.2d 1157, we held that a decision of the BTA was unreasonable because its decision was internally inconsistent. In this case, the BTA's decision was internally inconsistent and unreasonable because it accepted Ramsland's rental and capitalization amounts for calculating external obsolescence, when it had rejected the same amounts for calculating value using the income approach to value. Rates and amounts that are invalid for calculating value under one method of estimating value are invalid for calculating value under other methods.

{¶ 41} The second method used by Ramsland to calculate external obsolescence was based on the shortfall in sales (1) between the sales predicted by Dillard's and actual sales and (2) between what Ramsland considered average sales, as identified in his income approach, and actual sales. This method for determining obsolescence is not one of the three methods for calculating external obsolescence mentioned in The Appraisal of Real Estate. In this second method, Ramsland took the shortfall in actual sales and calculated a 26.31 percent shortfall based on sales as projected by Dillard's, and a 39.88 percent shortfall based on average sales, as estimated by Ramsland. Ramsland then used those shortfall percentages to reduce the value he had determined by the cost method, after deduction of physical and functional depreciation. We find this method of calculating external obsolescence unreasonable.

{¶ 42} The fallacy of using sales per square foot as a factor to determine value can be demonstrated by the following example: Assume two identical anchor department store buildings in the same mall, operated by different owners. If one store has higher sales per square foot than the other, is the property housing the store with the lower sales worth less than the building housing the store with the higher sales? While the store with the higher sales per square foot may be worth more as a business, that consideration must be separated from a valuation of the real property. The two buildings in the hypothetical mall should be valued

the same if they are identical. Benton, one of Higbee's appraisers, testified concerning stores with different sales, "There shouldn't be any difference in the real estate. If you're valuing the business, there would be; but if you're valuing real estate, there shouldn't be any difference." Ramsland, Higbee's other appraiser, admitted that non-real-estate factors, such as management and advertising, could affect sales of a department store.

{¶ 43} Here, Dillard's set a projected sales amount that it expected the SouthPark store to reach. By the lien date, which was about two months after the SouthPark mall opened for business, sales had not reached the amount projected by Dillard's. Furthermore, sales at the SouthPark store did not reach the amounts projected by Dillard's during the four years following the opening. If property of this type were to be valued based on the owner's projection of sales, this could lead to a manipulation of sales projections, so that failure to attain the erroneous sales projection would result in a reduced valuation of the property. Furthermore, if a store's sales are below a certain average, its value would be reduced, without any regard to what a willing buyer would pay a willing seller. Ramsland was asked whether Dillard's projection was just wrong, and he stated that he thought in retrospect it was. When asked whether sales would be higher if Kaufmann's went into Dillard's space, Benton, one of Higbee's appraisers, agreed that he would expect them to be higher.

{¶ 44} All of Ramsland's methods for calculating external obsolescence depend on the success (or lack thereof) of the Dillard's business as measured by sales per square foot. If it is the real property that is being valued, its valuation cannot be made to vary depending on the success or lack thereof of the businesses located on the property. Admittedly, the location of a property may influence the sales made by a merchant at that property. However, the merchant's business practices may also influence sales. The business factors and the real-property factors must be separated when the real property is being valued for tax purposes. How the business factors and the real-property factors are separated in valuing real property is a matter of proof.

{¶ 45} It is apparent from a review of the record in this case that real-property transactions involving anchor department stores are conducted differently from other real-property transactions. Even though Higbee purchased the land for $10, neither of Higbee's appraisers valued the land at $10. Ramsland's valuation of $4,250,000 was accepted by the BTA and has not been challenged by Higbee in its cross-appeal. In addition to a favorable price for the land, the mall developer also gave Higbee $1,000,000 towards its build-out costs for the building. Ramsland testified that in two or three malls he knew of, Nordstrom department stores had been given an "absolutely free ride," i.e., free stores, "because the perception of a mall with a Nordstrom in it is it is a class A mall." Ramsland

explained that anchors bring value to mall developers and that anchors do the advertising and bring in traffic. The relationship between the developers and the anchor stores is "symbiotic." However, there was virtually no evidence offered in this case on the effect on value of the relationship between the developer and the anchor store as formalized in their construction-and-operating-reciprocal-easement agreement ("COREA"), which sets operating hours, and other agreements between the developer and the anchor-store owner. What, if any, effect the COREA has on the sale price of anchor stores was not discussed.

{¶ 46} The testimony in this case clearly indicates that the economics of real-property transactions involving anchor stores and mall developers is different from the usual types of real estate transactions. Nevertheless, for ad valorem tax purposes the property still must be valued on the basis of what a willing buyer would pay a willing seller for the real property.

{¶ 47} The BTA found that "the most reliable evidence is presented by the cost approach." Without the deduction for external obsolescence, which we have found erroneous in this case, the cost-based valuation is not dependent upon consideration of sales per square foot. The Appraisal of Real Estate states, "The cost approach is most applicable in valuing new or proposed construction when the improvements represent the highest and best use of the land and land value is well supported." Id. at 354. Because the building in question had only been open for about two months on the January 1, 1997 lien date, the application of a cost-based valuation by the BTA was reasonable.

{¶ 48} Strongsville next contends that the BTA abused its discretion in accepting a valuation of the property based on the highest and best use of the property being artificially limited to a "full anchor" department store. We reject this contention, as we do not believe that the BTA abused its discretion in accepting the highest and best use of the property as an anchor department store. In discussing the concept of abuse of discretion in *Strongsville Bd. of Edn. v. Cuyahoga Cty. Bd. of Revision* (1990), 53 Ohio St.3d 254, 256–257, 559 N.E.2d 1351, this court referred to its prior statement in *Ojalvo v. Bd. of Trustees of Ohio State Univ.* (1984), 12 Ohio St.3d 230, 232, 12 OBR 313, 466 N.E.2d 875, wherein it stated that "the standard for 'abuse of discretion' is readily defined, albeit broadly, as more than an error of law or judgment, but implies an attitude on the part of the trial court that is unreasonable, arbitrary, or unconscionable." Strongsville does not refer to any actions of the BTA that would meet this abuse-of-discretion standard. Strongsville may not like the BTA's acceptance of Ramsland's opinion that the present use, as improved, was the highest and best use. However, there is evidence in Ramsland's testimony and appraisal report to support that conclusion. Absent a showing of abuse of discretion, the BTA's determination as to the credibility of witnesses and the weight given to their

testimony will not be reversed by this court. *Witt Co. v. Hamilton Cty. Bd. of Revision*, 61 Ohio St.3d at 157, 573 N.E.2d 661.

{¶ 49} Strongsville next contends that the BTA abused its discretion in accepting the land value determined by Ramsland, Higbee's appraiser. Basically, Strongsville is contending that Ramsland's valuation should not be accepted by the BTA. In *Wolf v. Cuyahoga Cty. Bd. of Revision* (1984), 11 Ohio St.3d 205, 207, 11 OBR 523, 465 N.E.2d 50, the court stated: "A great deal of appellants' argument is devoted to the rebuttal of appellees' expert testimony. Ultimately, they conclude that none of his conclusions is credible enough to be relied on by the BTA. However, such a determination is precisely the kind of factual matter to be decided by the BTA." The BTA's decision on land valuation was reasonable.

{¶ 50} Finally, Strongsville contends that the BTA improperly considered events (future sales per square foot) that were not known on the tax-lien date when determining external obsolescence. Because of our decision setting aside the BTA's determination of external obsolescence, we consider this issue moot.

{¶ 51} In its cross-appeal, Higbee contends that the BTA erred in excluding functional obsolescence calculated by Ramsland in the amount of $3,445,000. Higbee's other appraiser, Benton, testified that there were no functional inadequacies in the building. Functional obsolescence is described in The Appraisal of Real Estate as follows:

{¶ 52} "Functional obsolescence is caused by a flaw in the structure, materials, or design of the improvement when compared with the highest and best use and most cost-effective functional design requirements at the time of appraisal. * * *. Functional obsolescence is attributable to defects within the property * * *. Functional obsolescence, which may be curable or incurable, can be caused by a deficiency, which means that some aspect of the subject property is below standard in respect to market norms. It can also be caused by a superadequacy, which means that some aspect of the subject property exceeds market norms." Id. at 403.

{¶ 53} Ramsland testified that one of the causes of functional obsolescence at the Dillard's SouthPark store was its trade dress. Ramsland explained that the term "trade dress" is the signature identification of a store through its overall look, so that when customers walk into a store, they know from the ceiling and floor treatments and the lighting that they are in a Dillard's rather than a Kaufmann's or a Sears. Ramsland then went on to explain that if the store were to be put up for sale, a buyer would not pay for Dillard's trade dress because the buyer would put in its own trade dress.

{¶ 54} To account for what he described as a superadequacy of the finish of the Dillard's store, Ramsland calculated an amount for functional obsolescence. To arrive at that amount, Ramsland used the Marshall & Swift valuation service to

calculate a replacement value for a generic department store. Then, using the same valuation service, he calculated a replacement value for a Dillard's store, which he considered to be an above-average department store. The difference between the replacement value for the generic department store and the replacement value for the Dillard's-quality store was approximately $3,445,000. Ramsland attributed the $3,445,000 difference in replacement cost to functional obsolescence.

{¶ 55} The BTA rejected Ramsland's calculation of functional obsolescence, stating, "When placing the subject within the marketplace established by the mall and the other anchor stores, a potential buyer would have to emulate a store that offers a competitive shopping environment. A potential buyer is not seeking a generic store but a department store at South Park Mall." In addition, the BTA found that there was no evidence that a buyer would change all the trade dress.

{¶ 56} Furthermore, even if there were evidence to support Ramsland's supposition, we find that Ramsland's calculations would lead to an excessive result. While Ramsland contends that the superadequacy for the SouthPark store is found in the trade dress, his calculation of functional obsolescence is not limited to trade dress.

{¶ 57} When Ramsland determined his cost for the generic store, every component of the building was downgraded, not just the trade dress. Thus, Ramsland's downgrade started with a lesser cost for the excavation and site preparation and continued throughout all elements of the building. However, there was no claim that, other than trade dress, any other elements of the existing building were superadequate. By using this method, Ramsland calculated functional obsolescence for parts of the building other than just trade dress, which he said was the only element that was superadequate.

{¶ 58} In its cross-appeal, Higbee contends that even if the elimination of the functional obsolescence is not reversed, the BTA should recalculate the amount of external obsolescence. This contention is moot because we have eliminated the BTA's reduction for external obsolescence.

{¶ 59} For all of the foregoing reasons, we find the BTA's decision reducing the valuation for external obsolescence to be unreasonable and unlawful, and we reverse it. We find the remainder of the BTA's decision to be reasonable and lawful. Accordingly, we remand the cause to the BTA for further proceedings in accordance with this opinion.

Decision affirmed in part
and reversed in part,
and cause remanded.

MOYER, C.J., RESNICK, PFEIFER, LUNDBERG STRATTON, O'CONNOR, O'DONNELL and LANZINGER, JJ., concur.

Kolick & Kondzer and Daniel J. Kolick, for appellants and cross-appellees.

Todd W. Sleggs & Associates and Todd W. Sleggs; Fredrikson & Byron, P.A., and Thomas R. Wilhelmy, for appellee and cross-appellant.