[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *HCP EMOH, L.L.C. v. Washington Cty. Bd. of Revision,* Slip Opinion No. 2018-Ohio-4750.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2018-OHIO-4750

HCP EMOH, L.L.C., APPELLANT, *v.* WASHINGTON COUNTY BOARD OF

REVISION ET AL., APPELLEES.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *HCP EMOH, L.L.C. v. Washington Cty. Bd. of Revision,* Slip Opinion No. 2018-Ohio-4750.]**

*Taxation—Real-property valuation—An appraiser is permitted but not required to rely on apartment comparables when valuing an assisted-living facility— Board of Tax Appeals ("BTA") did not abuse its discretion in rejecting property owner's appraisal but did err in adopting county's appraisal, which was based on unreliable data that led appraiser to value the business rather than the realty—BTA's decision vacated and cause remanded to BTA.*

(No. 2016-1712—Submitted September 11, 2018—Decided November 30, 2018.)

APPEAL from the Board of Tax Appeals, No. 2015-700.

_____

**Per Curiam.**

**{¶ 1}** This case revisits an issue that arises in the context of valuing an assisted-living facility—namely, how should an appraiser go about separating the facility's business value from the value of the realty? The Board of Tax Appeals ("BTA") rejected the method espoused by an appraiser for appellant, property owner HCP EMOH, L.L.C., who relied on apartment comparables to derive an opinion of value for the subject property. The BTA instead adopted the valuation reached by an appraiser for appellees, Washington County Board of Revision ("BOR") and Washington County Auditor (collectively, "the county"), who eschewed apartment comparables in favor of data from the assisted-living-facility market. On appeal, HCP EMOH first argues that the case law requires reliance on apartment comparables when valuing an assisted-living facility. It next makes several evidentiary arguments; principal among these is the claim that the county's appraiser used unreliable data that led him to value the business rather than the realty.

**{¶ 2}** HCP EMOH's first argument is mistaken. The case law *permits* but does not *require* consideration of apartment comparables. HCP EMOH's principal evidentiary argument does, however, have merit. Because the county's appraiser was not scrupulous in selecting data suitable for a realty-only valuation, we agree that the BTA erred in adopting the county's appraisal. For this reason, we vacate the BTA's decision and remand the case for further proceedings.

## FACTS AND PROCEDURAL BACKGROUND

**{¶ 3}** The property at issue is located in Marietta and consists of two parcels constituting almost seven acres of land. The property is improved with a one-story assisted-living facility that was built in 1997. The facility has 89 units that range from 286 to 363 square feet, each of which comes furnished with a kitchenette, a shower, and toilet facilities. Common areas make up roughly half of the facility's space and include lounges, multipurpose rooms, dining rooms, a beauty/barber

shop, and a commercial kitchen. The facility provides numerous services, including meals, medical assistance, and recreational activities. For tax year 2014, the auditor valued the property at $6,042,620. HCP EMOH filed a complaint against this valuation, which was heard by the BOR.

*BOR proceedings*

{¶ 4} At the BOR hearing, HCP EMOH presented a memorandum and supporting documents that set forth an analysis using the sales-comparison and income approaches to value based on apartment data. The memorandum reached a valuation of $2,900,000. The BOR rejected this proposed figure and retained the auditor's valuation.

*BTA proceedings*

{¶ 5} HCP EMOH appealed to the BTA, where it presented an appraisal report prepared by Richard G. Racek, a certified appraiser. Racek opined that the property's highest and best use, as vacant, is the development of a permitted residential use and, as improved, is its continued use in a multifamily capacity. Racek applied the sales-comparison and income approaches to value, both drawing from apartment data. After reconciling the two approaches, he reached a final valuation of $3,550,000. Racek justified his reliance on apartment data rather than assisted-living-facility data based on what he viewed as the distortive effects that the facility's services have on the value of the realty. According to Racek, including the value of the services in the analysis would generate rental rates of $2,000 to $4,000 a month for a conventional apartment complex. He characterized such rates as "ludicrous" and maintained that they would not be sustainable in the marketplace.

{¶ 6} For its part, the county presented an appraisal report prepared by Zach Bowyer. Bowyer received a temporary Ohio certification to perform appraisal work in the case. He opined that the property's highest and best use, as vacant, is the development of a seniors housing property and, as improved, is its existing use

as a seniors housing development—specifically, assisted living with memory-care services.

**{¶ 7}** Bowyer applied both the income and sales-comparison approaches to value, but he placed no weight on the sales-comparison approach, instead using it only to check the reasonableness of the conclusions he reached after applying the income approach. Bowyer stated that for his income-approach analysis, his primary criterion was to find comparable properties offering assisted-living and memory-care services similar to the subject property. Bowyer began by computing a net operating income of $1,094,718 for the going concern (as opposed to the real estate). He then strove to isolate the cash flow attributable to the real estate by performing what he called a "lease coverage analysis." As Bowyer explained, the "lease coverage analysis is the technique applied to allocate the portion of the overall cash flow (net operating income) to the going concern that is attributed to the real estate only."

**{¶ 8}** To perform his lease-coverage analysis, Bowyer began by computing a market-derived lease-coverage ratio. Generally speaking, the numerator of this ratio represents the net operating income for a comparable going concern, and the denominator represents the absolute net lease payment associated with that comparable. Bowyer explained that an absolute net lease payment indicates a real-estate-only lease payment—that is, the rent collected by an owner of real estate. If, as here, the net operating income of a particular going concern is known, then the lease-coverage ratio can, according to Bowyer, be divided into that net operating income to obtain the cash flow attributed to the real estate. Bowyer analogized this resultant cash flow to an inferred lease payment.

**{¶ 9}** To calculate his lease-coverage ratio, Bowyer evaluated nine market transactions for which an actual lease, a Form 10-K, or an appraisal was available for review. For each transaction, Bowyer identified the net operating income per unit (the numerator) for the going concern and the rent per unit (the denominator)

under the terms of an absolute net lease. Based on this data, Bowyer derived a preliminary lease-coverage ratio of 1.25 and then upwardly adjusted it to 1.29 to account for real-estate taxes. He then divided this ratio into the net operating income for the going concern to arrive at $848,619, which, he stated, represented the cash flow to the real estate only. After applying a realty-only capitalization rate of 9.315 percent, Bowyer arrived at a rounded valuation of $9,100,000 for the real estate.

**{¶ 10}** The BTA adopted Bowyer's appraisal. It opined that neither this court's lead opinion in *Health Care REIT, Inc. v. Cuyahoga Cty. Bd. of Revision*, 140 Ohio St.3d 30, 2014-Ohio-2574, 14 N.E.3d 1009, nor the BTA's own decisions require an appraiser to rely on apartment data in valuing an assisted-living facility. Instead, the BTA understood the case law as teaching "that an appraisal that properly distinguishes the value accorded to the real property from the value attributable to the business operations may be a reliable indication of value." BTA No. 2015-700, 2016 WL 6434046, *4 (Oct. 26, 2016). While acknowledging that Bowyer's appraisal used the value of the going concern as a starting point, it nevertheless found that he "thoroughly and competently accounted for the value attributable to the assisted living facility operations to allocate the value attributable to the subject real property." *Id.* at *5. The BTA also found that Bowyer's list of assisted-living-facility comparables was superior to Racek's list of apartment comparables, noting that the subject property's units lack the amenities found in a traditional apartment. *Id.* HCP EMOH filed a motion for reconsideration. The BTA denied the motion, and this appeal followed.

**STANDARD OF REVIEW**

**{¶ 11}** We will affirm a BTA decision that is reasonable and lawful. *Satullo v. Wilkins*, 111 Ohio St.3d 399, 2006-Ohio-5856, 856 N.E.2d 954, ¶ 14. We review de novo the BTA's resolution of legal issues but defer to the BTA's findings concerning the weight of the evidence if there is record support for them. *Lunn v.*

5

*Lorain Cty. Bd. of Revision*, 149 Ohio St.3d 137, 2016-Ohio-8075, 73 N.E.3d 486, ¶ 13.

## DISCUSSION

**{¶ 12}** HCP EMOH presents five issues for our consideration. The first concerns whether the law requires an appraiser to rely on apartment comparables when valuing an assisted-living facility. The second and third relate to the BTA's evaluation of Bowyer's and Racek's appraisals. The fourth concerns the BTA's denial of HCP EMOH's motion for reconsideration. And the fifth is a constitutional challenge to the BTA's decision. We address each issue in turn.

*An appraiser need not rely on apartment comparables when valuing an assisted-living facility*

**{¶ 13}** HCP EMOH argues that the BTA departed from established law when it credited Bowyer's appraisal method, which eschewed reliance on conventional apartment buildings as comparables. It stresses *Health Care REIT*, 140 Ohio St.3d 30, 2014-Ohio-2574, 14 N.E.3d 1009, in which three justices of this court concluded that "an appraiser may rely on apartment comparables when valuing an assisted-living facility," *id.* at ¶ 44. HCP EMOH also relies on *LTC Properties, Inc. v. Licking Cty. Bd. of Revision*, 133 Ohio St.3d 111, 2012-Ohio-3930, 976 N.E.2d 852, in which we endorsed the use of "apartment buildings as a point of comparison when valuing the real property of a congregate-care facility under the sales-comparison or income-capitalization approaches," *id.* at ¶ 21. These excerpts notwithstanding, neither *Health Care REIT* (noncontrolling as it is) nor *LTC* say that an appraiser is *required* to rely on apartment comparables when valuing an assisted-living facility. Instead, these decisions *permit* reliance on such comparables.

**{¶ 14}** The guiding principle from the case law is not, as HCP EMOH contends, that one category of comparables must be used instead of another. Rather, it is that an appraiser must exercise care to isolate the value of the realty

6

from the value of the business. That understanding took shape in *Dublin Senior Community Ltd. Partnership v. Franklin Cty. Bd. of Revision*, 80 Ohio St.3d 455, 687 N.E.2d 426 (1997), which addressed the valuation of a congregate-care center. The facility charged for such services as food and housekeeping, which were assignable as business activities, and it also charged rent for the apartments, which was assignable as a real-estate activity. We explained that each type of activity occupies its own sphere and "must be kept separate" for the purpose of a real-estate valuation. *Id.* at 460; *accord Health Care REIT* at ¶ 41; *LTC* at ¶ 21.

**{¶ 15}** Based on the case law, we conclude that the BTA did not err simply by adopting an appraisal that eschewed reliance on apartment comparables. In reaching this conclusion, we draw support from *Youngstown Sheet & Tube Co. v. Mahoning County Bd. of Revision*, 66 Ohio St.2d 398, 402, 422 N.E.2d 846 (1981), in which we "decline[d] to bind the BTA to a particular method of valuation" and thereby avoided interference with the BTA's responsibilities to weigh evidence and make credibility assessments. It follows that any rule requiring the BTA to adopt an appraisal backed by apartment comparables would be inconsistent with that decision's logic.

*The BTA erred in adopting Bowyer's appraisal*

**{¶ 16}** HCP EMOH next asserts that the BTA erred in adopting Bowyer's appraisal and in rejecting Racek's appraisal. Turning first to Bowyer's appraisal, HCP EMOH asserts that the "crux of the problem" plaguing his income-approach analysis stems from the characteristics of the net leases that he used to calculate his lease-coverage ratio. In HCP EMOH's view, these leases reflect business value, not realty value. By relying on these leases, HCP EMOH asserts, Bowyer failed to separate business value from realty value.

**{¶ 17}** In evaluating this claim, we find the following exchange at the BTA hearing instructive:

[HCP EMOH's counsel:] So let's talk about these lease comparables that you used. First of all, all of the net leases are based on a percentage of the net operating income of the business for each of the facilities that are included.

[Bowyer:] Correct.

{¶ 18} That rental structure does not fare well under *Higbee Co. v. Cuyahoga Cty. Bd. of Revision*, 107 Ohio St.3d 325, 2006-Ohio-2, 839 N.E.2d 385. In *Higbee*, this court faulted a method of valuation that factored in a sales-per-square-foot metric because it conflated the value of the business with that of the realty. *Id.* at ¶ 42-44. To explain why, we hypothesized two stores that were identical except for their sales volume. Given the stores' similarities as real estate, we concluded that they should have the same realty value. But under a sales-per-square-foot metric, that conclusion would not follow. By using that metric, we explained, the store with the higher sales would have a higher realty value than the store with the lower sales even though both stores were in all other respects alike. *Id.* at ¶ 42. In pinpointing the problem with this method, we observed that "[i]f it is the real property that is being valued, its valuation cannot be made to vary depending on the success or lack thereof of the businesses located on the property." *Id.* at ¶ 44.

{¶ 19} The net leases from which Bowyer crafted his lease-coverage ratio are problematic in the way that the sales-per-square-foot metric from *Higbee* was: the leases reflect business value, not realty value. While not entitling the lessor to a right to receive the business income, Bowyer explained at the BTA hearing, the net leases nevertheless reflect the contracting parties' expectations about "what an operating business could achieve." As he put it, the net leases are "negotiated based on how [a] property is expected to perform." In structuring the leases this way, the contracting parties necessarily factored business value into the lease payments.

8

**{¶ 20}** Because Bowyer crafted his lease-coverage ratio from flawed inputs, it follows that any subsequent calculations built on the lease-coverage ratio, including his final opinion of value, are flawed, too. Given that Bowyer's analysis is tainted, we need not address, as a general matter, whether his lease-coverage analysis is a methodologically sound way to achieve a real-estate-only valuation.

**{¶ 21}** Our analysis does not deny deference to the BTA's evidentiary determinations. *See Musto v. Lorain Cty. Bd. of Revision*, 148 Ohio St.3d 456, 2016-Ohio-8058, 71 N.E.3d 279, ¶ 32. In adjudging whether the BTA's decision is reasonable and lawful, we must be assured that the BTA's findings of fact are supported by reliable and probative evidence. *Polaris Amphitheater Concerts, Inc. v. Delaware Cty. Bd. of Revision*, 118 Ohio St.3d 330, 2008-Ohio-2454, 889 N.E.2d 103, ¶ 18. "[I]f the record does not support, or if it contradicts, the BTA findings," reversal is warranted. *Id.* Here, the BTA described Bowyer's net leases as " 'real estate only' leases." 2016 WL 6434046 at *2. But as Bowyer's testimony makes clear, the BTA mischaracterized the structure of those leases. The leases are based on expected business performance and have nothing to do with the real estate. Because the record contradicts the BTA's finding, no deference is due.[1]

**{¶ 22}** We next address HCP EMOH's argument that the BTA erred in rejecting Racek's appraisal. HCP EMOH argues that his appraisal faithfully follows *Health Care REIT* by relying on apartment comparables. But as noted above, *Health Care REIT* is only a lead opinion and, in any event, that opinion *permits* but does not *require* reliance on apartment comparables.

**{¶ 23}** HCP EMOH next touts Racek's selection of apartment comparables and the adjustments made to them, claiming that they constitute probative and

---

1. We need not address HCP EMOH's criticisms of Bowyer's sales-comparison analysis. Bowyer stated that he put no weight on it, instead using it only to check the reasonableness of the conclusions he reached after applying the income approach. Both parties agreed at oral argument that his sales-comparison analysis had no bearing on the BTA's analysis. And HCP EMOH's brief describes Bowyer as relying on the income approach to value the property.

competent evidence of value. In evaluating arguments of a fact-bound character, we do not sit as a super BTA or try the facts anew. *E.g.*, *Olentangy Local Schools Bd. of Edn. v. Delaware Cty. Bd. of Revision*, 153 Ohio St.3d 241, 2017-Ohio-8385, 104 N.E.3d 736, ¶ 7. Instead, we grant the BTA "wide discretion in determining the weight to be given to the evidence and the credibility of the witnesses that come before it." *EOP-BP Tower, L.L.C. v. Cuyahoga Cty. Bd. of Revision*, 106 Ohio St.3d 1, 2005-Ohio-3096, 829 N.E.2d 686, ¶ 9. Unless the BTA abuses its discretion, its determinations will not be reversed. *Id.* at ¶ 14.

**{¶ 24}** Here, the BTA found "that the properties that Racek utilized for both his sales and rental comparables were significantly different from the subject property and that the adjustments made were insufficient to account for those differences." 2016 WL 6434046 at *5. For example, it noted the difference in amenities between an assisted-living facility and a traditional apartment, with the latter typically coming furnished with a full-sized kitchen. This type of evidentiary determination falls within the BTA's core competence as the finder of fact. *Meijer Stores Ltd. Partnership v. Franklin Cty. Bd. of Revision*, 122 Ohio St.3d 447, 2009-Ohio-3479, 912 N.E.2d 560, ¶ 20. It follows that the BTA did not abuse its discretion in evaluating Racek's appraisal.

**{¶ 25}** To summarize, the BTA erred in adopting Bowyer's appraisal but stayed within the bounds of its discretion in rejecting Racek's appraisal. Therefore, we vacate the BTA's decision and remand the case for further proceedings. On remand, the BTA must determine whether there is sufficient evidence to enable an independent valuation. If there is, the BTA must determine an independent value. If not, it may reinstate the value initially determined by the auditor. *See Apple Group Ltd. v. Medina Cty. Bd. of Revision*, 139 Ohio St.3d 434, 2014-Ohio-2381, 12 N.E.3d 1188, ¶ 16; *Groveport Madison Local Schools Bd. of Edn. v. Franklin Cty. Bd. of Revision*, __ Ohio St.3d __, 2018-Ohio-4286, __ N.E.3d __, ¶ 11-15 (collecting cases).

*HCP EMOH's other arguments need not be addressed*

{¶ 26} Because we order vacatur and remand, we need not address HCP EMOH's arguments concerning the BTA's denial of its motion for reconsideration and the BTA's alleged violation of Article XII, Section 2 of the Ohio Constitution.

**CONCLUSION**

{¶ 27} For the foregoing reasons, we vacate the BTA's decision and remand the case to the BTA for further proceedings.

Decision vacated

and cause remanded.

O'CONNOR, C.J., and O'DONNELL, KENNEDY, and BROWN, JJ., concur.

DEWINE, J., dissents, with an opinion joined by FRENCH and DEGENARO, JJ.

SUSAN D. BROWN, J., of the Tenth District Court of Appeals, sitting for FISCHER, J.

_____

**DEWINE, J., dissenting.**

{¶ 28} The majority reverses the decision of the Board of Tax Appeals ("BTA") based on an isolated snippet of an expert's testimony without considering the expert's testimony as a whole. In the process, it fails to accord the factual findings and credibility determinations of the BTA the deference that they are ordinarily given by this court. In view of the entire record before us and the deference due the finder of fact, the decision of the BTA should be affirmed. Because the majority sees it otherwise, I respectfully dissent.

{¶ 29} The scope of our review in tax appeals is limited. We grant deference to the BTA's factual determinations and credibility assessments. *Accel, Inc. v. Testa*, 152 Ohio St.3d 262, 2017-Ohio-8798, 95 N.E.3d 345, ¶ 16. "When it reviews appraisals, the BTA is vested with wide discretion in determining the weight to be given to the evidence and the credibility of the witnesses that come

before it." *EOP-BP Tower, L.C.C. v. Cuyahoga Cty. Bd. of Revision*, 106 Ohio St.3d 1, 2005-Ohio-3096, 829 N.E.2d 686, ¶ 9.

{¶ 30} The majority is correct in rejecting HCP EMOH's argument that when valuing an assisted-living facility, an appraiser may use only apartment complexes for comparison. Comparables other than apartment complexes may be used, so long as an appraiser "exercise[s] care to isolate the value of the realty from the value of the business." Majority opinion at ¶ 14. The appraiser who testified on behalf of the county, Zach Bowyer, represented that he did exactly that. Bowyer testified that he evaluated nine assisted-living facilities to come up with a "lease coverage ratio." The ratio was derived by dividing the facilities' net operating incomes by the net lease payments for the properties. By applying the lease-coverage ratio to HCP EMOH's net operating income, Bowyer explained, he was able to isolate the amount of cash flow attributable to the real estate only—an amount that he capitalized to arrive at his valuation for the property.

{¶ 31} The BTA concluded after hearing Bowyer's testimony that "although he utilized the value of the going concern as the starting place for his analysis, Bowyer thoroughly and competently accounted for the value attributable to the assisted living facility operations to allocate the value attributable to the subject real property." BTA No. 2015-700, 2016 WL 6434046, *5 (Oct. 26, 2016).

{¶ 32} But the majority determines that the BTA's unequivocal conclusion was not supported by reliable and probative evidence. Specifically, the majority finds that the BTA's characterization of the net leases used by Bowyer to derive the ratio as " 'real estate only' leases," *id.* at *2, was contradicted by the record. And because the majority determines, contrary to the BTA's finding, that the leases were not "real estate only" leases, it concludes that Bowyer's approach fails under the reasoning we used in *Higbee Co. v. Cuyahoga Cty. Bd. of Revision*, 107 Ohio St.3d 325, 2006-Ohio-2, 839 N.E.2d 385.

{¶ 33} To justify its conclusion, the majority zeroes in on a single exchange between Bowyer and HCP EMOH's counsel at the BTA hearing. When asked whether the net leases were "based on a percentage of the net operating income of the business for each of the facilities," Bowyer answered, "Correct." But this isolated snippet from the hearing transcript ought to be considered in the context of Bowyer's entire testimony.

{¶ 34} During direct examination, Bowyer described the leases he used to derive the lease-coverage ratio as "absolute net" leases—that is, "the landlord owns the real estate and they collect rent from the tenant for operating their business out of the real estate." Bowyer continued, "So this is simply, you know, absolute net real-estate only, lease transactions."

{¶ 35} Later in cross-examination—after the snippet of testimony on which the majority hangs its hat—Bowyer again made clear that the leases reflected the real-estate value, not the business value. He analogized the leases he had used to the rent collected by an owner of an industrial building:

> [Bowyer:] * * * And there's a completely separate owner of that real estate that owns the warehouse and the real estate, and they lease the building to [the company operating a business] to conduct their business out of.
>
> However, they have no ownership or any involvement unless they're getting a percentage rent or an overage rent or something like that, which they typically don't, and it's not going to be the case here, but they get a rent that represents the ownership of their real estate.
>
> Q. Except in this case it's not based—your scenario would be based on the business of—the net operating income of [the company operating a business] in that—

A. But the owner of the real estate is getting none of that business money.

Q. Okay. But in this scenario, they are.

A. No, they're not.

Q. They have to be, because the bottom line is everything is derived from the income and the expenses of the business.

A. *No, that is not accurate.*

(Emphasis added.)

{¶ 36} And once more during redirect examination, Bowyer made explicit that the leases were "rent only" leases:

Q. * * * One final question. These leases on page 79, and I think this is pretty clear already, but let's just make sure, these do not include any [furniture, fixtures, and equipment].

A. Correct.

Q. Okay. And these would not include any income from the business that the tenant generates.

A. *Absolutely not.*

(Emphasis added.)

{¶ 37} To the extent that parts of Bowyer's testimony conflicted, it was the BTA's role, not ours, to determine whether his explanation was credible. The BTA credited his explanation, finding that "Bowyer's appraisal is a more reliable indication of value for the subject property" than the appraisal of HCP EMOH's expert. 2016 WL 6434046 at *5.

{¶ 38} Given the BTA's findings, the approach used by Bowyer was not fatally flawed like the one we analyzed in *Higbee*, 107 Ohio St.3d 325, 2006-Ohio-

14

2, 839 N.E.2d 385. Rather than factoring in the business's value, as the appraiser did in *Higbee*, *id.* at ¶ 41 and 44, Bowyer took pains to isolate the real-estate value from the business value.

{¶ 39} The BTA's finding regarding the leases was amply supported by the record. I would afford our customary deference to the BTA's findings and affirm its decision.

FRENCH and DEGENARO, JJ., concur in the foregoing opinion.

_____

Vorys, Sater, Seymour & Pease, L.L.P, Karen H. Bauernschmidt, and Nicholas M.J. Ray, for appellant.

Rich & Gillis Law Group, L.L.C., and Kelley A. Gorry, for appellees.

Joseph T. Deters, Hamilton County Prosecuting Attorney, and Thomas J. Scheve and Jay R. Wampler, Assistant Prosecuting Attorneys, urging affirmance for amicus curiae, Hamilton County Auditor.

_____