LTC PROPERTIES, INC., APPELLANT, *v.* LICKING COUNTY BOARD OF

REVISION ET AL., APPELLEES.

[Cite as *LTC Properties, Inc. v. Licking Cty. Bd. of Revision*,

133 Ohio St.3d 111, 2012-Ohio-3930.]

*Taxation—Valuation—Party challenging board of revision's valuation of real property has burden of showing that valuation was incorrect—Decision affirmed.*

(No. 2011-1154—Submitted August 22, 2012—Decided September 6, 2012.)

APPEAL from the Board of Tax Appeals, No. 2008-A-1010.

_____

**Per Curiam.**

{¶ 1} LTC Properties, Inc., which owns Chestnut House Assisted Living, a congregate-care assisted-living facility in Newark, Licking County, contests the tax-year 2007 valuation of its property as found by the auditor, as retained by the Licking County Board of Revision ("BOR"), and as affirmed by the Board of Tax Appeals ("BTA"). On the merits, LTC contends that the auditor overvalued its property by predicating his cost-based valuation on the cost schedule for nursing homes and private hospitals rather than on the cost schedule for apartment buildings with 20 to 39 rental units. LTC hypothesizes that had the auditor used the cost schedule for apartments as a starting point, his ultimate conclusion of value would have been lower. In addition, LTC alleges a procedural error in the BTA's denial of LTC's request for a continuance of the evidentiary hearing.

{¶ 2} Because we disagree with both of LTC's arguments, we affirm the decision of the BTA.

**Facts**

**{¶ 3}** For tax year 2007, the Licking County auditor, an appellee, assigned a true value of $1,975,000 to Chestnut House Assisted Living, which consists of 2.43 acres, improved with a 25,824 square-foot building and a paved parking area. The auditor's land value was $307,400, and the value of improvements was $1,667,600. The property record card indicates that the auditor used the "nursing home" cost schedule, which attributed a cost-based value of $92.50 per square foot for the building. The county also applied a grade-factor adjustment of 110 percent, to derive a "replacement-cost-new" figure of $2,627,590. Next, the county applied a 25 percent reduction for obsolescence, which led to a cost-less-depreciation figure of $1,970,694 for the building.

**{¶ 4}** But obsolescence was merely one adjustment. The actual amount of cost value assigned to the building was $1,653,130 (i.e., $1,667,600 minus the cost of the paved area, which was $14,470). That number reflects a substantial reduction from the $1,970,694 figure previously determined to be the cost-less-depreciation associated with the facility. Thus, the auditor's obsolescence adjustment, together with additional adjustments, lowered the original square-footage computation by 37 percent—from $2,627,590 to $1,653,130. Indeed, the valuation of the building represents almost a 31 percent reduction from the figure derived by multiplying the nursing-home cost figure of $92.50 per square foot by the 25,824 square feet of the building.

**{¶ 5}** Appellant, LTC Properties, Inc., filed a valuation complaint on March 24, 2008, with the BOR, seeking a reduced value of $1,000,000. The Newark City Schools Board of Education ("school board") filed a countercomplaint on April 28, and the BOR held a hearing on May 20, 2008.

{¶ 6} At the hearing, LTC presented the testimony[1] of William McVeigh, the property tax manager for Assisted Living Concepts, the parent of LTC. McVeigh asserted that Chestnut House is an assisted-living facility with 39 efficiency-apartments, 38 of which were then occupied. McVeigh offered an income-capitalization analysis that estimated the facility's value at $54 per square foot, for a true value of approximately $1,380,000 for the facility as a whole. The auditor's valuation of $1,975,000, by contrast, reflects a valuation of some $76 per square foot. On cross-examination, McVeigh explained that the rent number was generated by market-driven surveys "for this specific purpose." McVeigh also distinguished the $1,200 to $1,800 per month that residents actually pay as "service fees," only a portion of which can properly be characterized as rent that relates to the value of the realty. Additionally, McVeigh contested the propriety of the auditor's using the nursing-home and private-hospital category for cost-valuation purposes. On cross-examination, McVeigh conceded that he was neither an employee nor an owner of the taxpayer and that he was not a certified appraiser.

{¶ 7} By order dated July 3, 2008, the BOR retained the auditor's valuation of the property, and LTC appealed to the BTA on July 10, 2008. On November 14, 2008, the school board filed a motion to compel discovery of LTC's witnesses and exhibits, which recited that the school board had served interrogatories and document requests on LTC on September 12 and had followed up with LTC twice. On December 9, 2008, the BTA denied the motion to compel on the grounds that it had been filed more than 120 days after the filing of the appeal, which is outside the time limit for seeking the board's involvement in

---

1. The BOR hearing was transcribed by a court reporter, and the transcript does not show that McVeigh was sworn. Nor does the transcript show any objection to his giving unsworn testimony. We will regard the absence of an objection to the testimony on account of the witness's not having been sworn as a waiver of the point. *See Stores Realty Co. v. Cleveland*, 41 Ohio St.2d 41, 43, 322 N.E.2d 629 (1975).

discovery pursuant to Ohio Adm.Code 5717-1-11. But the BTA order also admonished LTC that ignoring the discovery request could lead to exclusion of its evidence.

{¶ 8} The BTA set the case for hearing on April 5, 2010. The county and the school board filed disclosures of witnesses and/or exhibits on March 19 and 22, 2010, pursuant to Ohio Adm.Code 5717-1-15(I), which requires such disclosure at least 14 days before the scheduled hearing. LTC made no such disclosures. Then, on March 26, 2010, 10 days before the scheduled hearing, LTC sent a letter requesting continuance of the hearing. The letter tersely stated, "Our appraiser is Richard Racek" and that he was "unavailable on [April 5]," without offering any reason for the appraiser's unavailability or for the failure to disclose the appraiser and his report previously. On March 29, the county filed a memorandum opposing the continuance, to which LTC responded on March 30.

{¶ 9} By order dated March 30, 2010, the BTA denied the continuance. The BTA noted that LTC had ignored discovery and that the school board's witness disclosure had objected to any witnesses or exhibits for LTC because of LTC's disregard of the discovery requests seeking that very information. The BTA next noted that LTC was in violation of both the 14-day disclosure rule and division (C) of Ohio Adm.Code 5717-1-15, which requires a continuance request to be filed no later than 14 days before the scheduled hearing. Based on the multiple rule violations and the failure to state good cause, the BTA denied the continuance. With respect to the request that LTC witnesses and exhibits be excluded, the BTA deferred judgment.

{¶ 10} The three parties—LTC, the county, and the school board—appeared through counsel at the April 5 hearing. Counsel for LTC read aloud portions of McVeigh's testimony to the BOR and presented two exhibits, one showing cost per square foot used by the county for apartments, the other showing property record cards of other assisted-living facilities. The BTA received the

exhibits over objection of the county and the school board. The BTA then entertained briefs from the parties.

{¶ 11} On June 7, 2011, the BTA issued its decision. As for McVeigh's presentation to the BOR, the BTA declined to adopt his conclusions because "there is no data included to support the conclusions reached." *LTC Properties, Inc. v. Licking Cty. Bd. of Revision*, BTA No. 2008-A-1010, 2011 WL 2306065, *2 (June 7, 2011). With respect to LTC's contention that the auditor should have used the apartment cost schedules as the starting point, the BTA held that although it had in the past "adopted, at least in part, many appraisals of assisted living facilities that have relied upon comparisons of the subject facilities to apartment complexes, there is no requirement that such comparisons be made." *Id*., *4. Acknowledging that "the particular code that a county assigns to a property may impact its valuation, it is clearly not the only factor that determines the valuation to be assigned," and as a result, "any appraisal of an assisted living facility that is based on rates attributable to an alternative code may require adjustments, which it appears were made by the county herein." *Id*., *5. The BTA found that LTC had "failed to demonstrate that the value which it seeks has a basis in the market, as of the tax lien date in question" and that the taxpayer had thereby not satisfied its burden of proof. *Id*. Accordingly, the BTA retained the county's valuation. *Id*. We now affirm.

## Analysis

{¶ 12} Because the true value of property is a "question of fact, the determination of which is primarily within the province of the taxing authorities," we have held that we will "not disturb a decision of the Board of Tax Appeals with respect to such valuation unless it affirmatively appears from the record that such decision is unreasonable or unlawful." *Cuyahoga Cty. Bd. of Revision v. Fodor*, 15 Ohio St.2d 52, 239 N.E.2d 25 (1968), syllabus. Moreover, because the BTA as the finder of fact has "wide discretion in granting weight to evidence and

credibility to witnesses," we will not reverse the BTA's determination of evidentiary weight and credibility "unless we find an abuse of this discretion." *Natl. Church Residence v. Licking Cty. Bd. of Revision*, 73 Ohio St.3d 397, 398, 653 N.E.2d 240 (1995).

*1. The BTA did not abuse its discretion when it*

*denied LTC's request for continuance*

{¶ 13} With respect to its contention that the BTA ought to have granted its request for a continuance of the April 5, 2010 hearing, the case law establishes and LTC agrees that the standard for our review is abuse of discretion. *Coats v. Limbach*, 47 Ohio St.3d 114, 116, 548 N.E.2d 917 (1989), quoting *Akron v. Pub. Util. Comm.*, 5 Ohio St.2d 237, 241, 215 N.E.2d 366 (1966). As a result, we will not reverse the BTA's determination without a showing that the board's "attitude is unreasonable, arbitrary or unconscionable." *See J.M. Smucker, L.L.C. v. Levin*, 113 Ohio St.3d 337, 2007-Ohio-2073, 865 N.E.2d 866, ¶ 16. Did the BTA abuse its discretion in this instance?

{¶ 14} We acknowledge at the outset the established principle that "courts liberally continue cases because denying a continuance would deny a litigant his day in court." *Coats* at 116, citing *State ex rel. Buck v. McCabe*, 140 Ohio St. 535, 538, 45 N.E.2d 763 (1942). Nonetheless, we hold that under the circumstances presented, the BTA was well justified in denying a continuance, even if the BTA indulges (as LTC suggests) in a common practice of granting a first continuance. In so holding, we focus on the requirement that an application for continuance be "made in good faith," one of the enumerated criteria for evaluating such motions. *Id*.

{¶ 15} The BTA's denial is justified because LTC's request for continuance arises in the context of its violation of the BTA's procedural rules in three pertinent respects. First, LTC violated Ohio Adm.Code 5717-1-11, which authorizes discovery, by willfully ignoring discovery requests that it disclose its

witnesses and exhibits. Second, LTC violated Ohio Adm.Code 5717-1-15(I) by failing to make disclosure of its witnesses and exhibits 14 days or more before the scheduled hearing. Third, LTC failed to comply with the requirement of Ohio Adm.Code 5717-1-15(C) that a request for continuance be filed 14 days or more before the scheduled hearing.

{¶ 16} In addition, LTC's request for continuance states no cause other than the vague "unavailability" of the named appraiser. Nor does it advance any reason why LTC should be excused from the operation of the rules it transgressed. Finally, it is not wholly irrelevant that the better part of two years had already elapsed since the filing of the appeal. Under all these circumstances, the BTA could reasonably have concluded within the exercise of its discretion that the request lacked good faith.

{¶ 17} This situation contrasts starkly with the facts in *Coats*, 47 Ohio St.3d 114, 548 N.E.2d 917, and *Strongsville Bd. of Edn. v. Cuyahoga Cty. Bd. of Revision*, 53 Ohio St.3d 254, 559 N.E.2d 1351 (1990), two cases in which we did find an abuse of discretion. In *Coats*, the BTA declined to convene a supplemental hearing for the purpose of hearing the testimony of an accountant, where the appellant had herself appeared at the first hearing and had explained that the accountant was ill. In finding an abuse of discretion, we noted that (1) the record corroborated the claim of the witness's ill health, (2) the witness's testimony was critical to the taxpayer's case, (3) the request was made in good faith, (4) the witness would likely have attended a future hearing, and (5) appellee had not objected to the continuance. *Id*. at 117. Similarly in *Strongsville*, we held that the Strongsville Board of Education had "proceeded with diligence when advised of the unavailability of his witness" in several enumerated respects. *Id*. at 256.

{¶ 18} Quite simply, the conduct of LTC here presents the very antithesis of diligence: a series of refusals to disclose its evidence that culminated in a

failure to offer a good-cause explanation for the rule violations or to give any actual reasons for the witness's absence. While the BTA could have decided to grant the continuance, we hold that under these circumstances, the board did not abuse its discretion in deciding not to.

*2. Using the nursing-home/private-hospital cost schedules as a starting point*
*for valuing an assisted-living facility was not an abuse of discretion*

**{¶ 19}** We turn now to the issue of the auditor's use of cost schedules in valuing LTC's property. Here, LTC acknowledges that its facility does not neatly fit into any of the rule-prescribed classifications set forth in Ohio Adm.Code 5703-25-10, so that some degree of improvisation on the auditor's part is necessary. But LTC asserts that the auditor's discretion in this regard is constrained by the principle that "the valuation of the realty portion of congregate care facilities in comparison to conventional apartment buildings has been the standard since *Chippewa Place* [*Dev. Co. v. Cuyahoga Cty. Bd. of Revision*, BTA No. 91-P-245, 1993 WL 384198 (Sept. 24, 1993)]." *Karrington of Kenwood, Ltd. v. Hamilton Cty. Bd. of Revision*, BTA No. 2006-M-2329, 2009 WL 4015361, *4 (Nov. 10, 2009). Under LTC's theory, this passage means that assisted-living facilities must be treated as apartment buildings for purposes of determining which cost schedule to use. We disagree for two reasons.

**{¶ 20}** First, the principle that LTC cites and relies on would appear to have little or no application to the cost approach. *Karrington of Kenwood* demonstrates the point. In that case, "the board accord[ed] the cost approach very little weight." Id., *5, fn. 1. More significant were the income and comparable-sale approaches, and the issue was whether to compare the subject property with other congregate-care facilities or with apartment buildings. The proper choice was apartment buildings, because under the comparable-sale approach, the comparison to other congregate-care facilities "did not accurately capture the value of the subject property" on account of "the sales [being] too remote in time

and distance." The same was true under the income approach, because "the income earned by an individual comparable" was found to be "too closely tied to the operating business of eldercare to be indicative of the value of the real property." *Id.*, *3. *See also Dublin Senior Community L.P. v. Franklin Cty. Bd. of Revision*, 80 Ohio St.3d 455, 460, 687 N.E.2d 426 (1997) (because a congregate-care center "comprises a combination of real estate and business activities," charging as it does both rental for the apartments and fees for ancillary services, "the two activities must be kept separate" when the real estate is being valued). These considerations led the board to conclude that "the use of congregate care facilities to compare either sale prices or income earned" would contravene the requirement "to base value for ad valorem tax purposes on value in exchange and not value in use." *Karrington*, *3.

{¶ 21} We do not think that these concerns directly apply in the cost-valuation context. When sale prices are compared, the sale price of a congregate-care facility may include elements of business value that relate to the provision of ancillary services as opposed to the rental of realty; likewise, when income is capitalized to determine value, the income of a congregate-care facility must be analyzed into its rental and service-fee components in order to determine that portion of income that relates to realty. *Both* these considerations militate toward using apartment buildings as a point of comparison when valuing the real property of a congregate-care facility under the sales-comparison or income-capitalization approaches.

{¶ 22} By contrast, the application of cost schedules to a particular facility *inherently relates to the realty*: the items being "costed" are elements of a permanent improvement to the land that qualifies as part of the real-property tax base. *See* R.C. 5701.02 (defining real property to include "all buildings, structures, improvements, and fixtures of whatever kind on the land, and all rights and privileges belonging or appertaining thereto"). Under this definition, Ohio

tax law regards as real property "any property attached to land" unless the statutes otherwise establish the item to constitute personal property. *Thomas Steel Strip Corp. v. Limbach*, 61 Ohio St.3d 340, 341, 575 N.E.2d 114 (1991); *compare Funtime, Inc. v. Wilkins*, 105 Ohio St.3d 74, 2004-Ohio-6890, 822 N.E.2d 781, ¶ 14-16. Moreover, the distinction between the cost schedules for the nursing-home/private-hospital category and that for "apartments—20 to 39 rental units" in no way relates to a distinction between real property value and business value, but to the costs of different kinds of structures adapted for particular purposes. As a result, the decision of which cost category to employ does not appear to correlate with the issue of segregating business value from real property value, and LTC has cited no authority indicating that it does.

{¶ 23} Our second area of disagreement with LTC's argument relates to the potential dissimilarities between assisted-living facilities and ordinary apartments on the one hand, together with similarities between assisted-living facilities and nursing homes from the design standpoint. Unlike ordinary apartments, assisted-living units typically lack full kitchens in the apartments and instead have congregate dining areas, and the bathrooms and hallways have handrails for support and are extra wide to permit the passage of wheelchairs. *See Karrington*, BTA No. 2006-M-2329, 2009 WL 4015361, *2. These features, which add expense and are likely to be encountered in nursing homes and private hospitals as well, indicate the relevance of nursing-home/private-hospital costs in valuing assisted-living facilities. *Accord Harbor Court Ltd. Partnership v. Cuyahoga Cty. Bd. of Revision*, BTA No. 92-T-1054, 1994 WL 269639 (June 10, 1994), *10 (an appraisal's cost approach correctly used the cost manual's "homes for the elderly" category as opposed to the "conventional apartment buildings" category, given the similarity of structural characteristics).

{¶ 24} The similarity of the amenities incorporated into an assisted-living facility to those incorporated into a nursing home or private hospital makes it

appropriate, under the cost approach, to include the cost elements that relate to those amenities in the valuation of the property. That is so because the cost approach is driven by the "principle of substitution, which states that a rational, informed purchaser will pay no more for a property than the cost of acquiring an acceptable substitute with like utility." International Association of Assessing Officers, *Property Assessment Valuation* 127 (2d Ed.1996). Indeed, given that the goal of the cost valuation is to establish the high-end cap for what a buyer would be willing to pay for a facility *with the same utility*, it makes sense that the county auditor in this case would have used nursing-home costs as a starting point and adjusted downward to determine the value of LTC's facility. *See Dayton-Montgomery Cty. Port Auth. v. Montgomery Cty. Bd. of Revision*, 113 Ohio St.3d 281, 2007-Ohio-1948, 865 N.E.2d 22, ¶ 12 ("By determining the cost to replace existing improvements, the auditor establishes an upper limit to the amount a buyer would be willing to pay for an existing structure"), citing *Dinner Bell Meats, Inc. v. Cuyahoga Cty. Bd. of Revision*, 12 Ohio St.3d 270, 272, 466 N.E.2d 909 (1984); *Meijer, Inc. v. Montgomery Cty. Bd. of Revision*, 75 Ohio St.3d 181, 187, 661 N.E.2d 1056 (1996).

{¶ 25} Finally, we note that LTC characterizes the county's 25 percent reduction for obsolescence (plus the additional downward adjustment) as a "fudge factor" that does not justify using the nursing-home/private-hospital cost schedule. It is true that the basis for these reductions has not been explained by the county, but under the case law, the county does not bear the burden of offering such an explanation. *See Colonial Village, Ltd. v. Washington Cty. Bd. of Revision*, 123 Ohio St.3d 268, 2009-Ohio-4975, 915 N.E.2d 1196, ¶ 30 ("we reiterate that the county does *not* have the affirmative burden to establish as a general matter the accuracy of any appraisals that underlie its valuation of the property" [emphasis sic]). In this regard, LTC's citation of *Dayton-Montgomery Cty. Port Auth.*, 113 Ohio St.3d 281, 2007-Ohio-1948, 865 N.E.2d 22 ("*Port*

*Auth.*") is unavailing. As we explained in *Colonial Village*, *Port Auth.* presented an exception to the usual rule because "the developed record before the BTA negated the validity of the county's valuation of the property." *Colonial Village*, ¶ 24. Specifically, the taxpayer in *Port Auth.* had presented actual-cost evidence that negated the application of a 1.6 grade-factor adjustment to the cost figure from the schedules. *Port Auth.*, ¶ 7, 14, 16. By contrast, LTC's evidence does not rise to the level of placing the burden on the county to explain its computation.

### Conclusion

**{¶ 26}** For the foregoing reasons, we hold that the BTA's decision to affirm the county's use of the nursing-home/private-hospital cost schedule as a starting point in performing a cost valuation of LTC's assisted-living facility was neither unreasonable nor unlawful and that the BTA did not abuse its discretion by denying a continuance. We therefore affirm the decision of the BTA.

Decision affirmed.

O'CONNOR, C.J., and PFEIFER, LUNDBERG STRATTON, O'DONNELL, LANZINGER, CUPP, and MCGEE BROWN, JJ., concur.

_____

**PFEIFER, J., concurring.**

**{¶ 27}** I concur in whole with the majority opinion. I write separately as a cautionary tale for practitioners.

**{¶ 28}** All property owners and their counsel know that they have a heavy burden to overcome when challenging a valuation. So why, as in this case, make the situation worse by ignoring simple and obvious requirements? Continuances are routinely granted in tax cases, but not when the party seeking the continuance disregards well-established procedure, such as requesting the continuance in a timely fashion and disclosing its witnesses and exhibits. And if a corporate entity wants to challenge a valuation, it should send a certified appraiser or other

qualified expert, not an employee, however experienced.  It is well known that the only nonexperts competent to testify as to valuation are owners.  Finally, the best way to challenge a valuation is with a proper appraisal, which was not submitted in this case.  Little wonder that the property owner was unable to establish that the board of revision abused its discretion.

{¶ 29} I am sympathetic to the property owner in this case.  The valuation method used by the auditor to determine the value of a congregate-care assisted-living facility is questionable.  It seems more reasonable to base the cost on that of an apartment complex than on a nursing home or hospital.  But for a variety of reasons, the corporate property owner was not able to adequately prove its case.

_____

Wayne E. Petkovic, for appellant.

Kenneth W. Oswalt, Licking County Prosecuting Attorney, and Dennis E. Dove, Assistant Prosecuting Attorney, for appellees Licking County Board of Revision and Licking County Auditor.

Means, Bichimer, Burkholder & Baker Co., L.P.A., and Robert M. Morrow, for appellee Newark City Schools Board of Education.

_____