[**Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Health Care REIT, Inc. v. Cuyahoga Cty. Bd. of Revision,* **Slip Opinion No. 2014-Ohio-2574.**]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2014-OHIO-2574

HEALTH CARE REIT, INC., APPELLEE, *v*. CUYAHOGA COUNTY BOARD OF REVISION ET AL., APPELLEES; BEREA CITY SCHOOL DISTRICT BOARD OF EDUCATION, APPELLANT.

[**Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Health Care REIT, Inc. v. Cuyahoga Cty. Bd. of Revision,* **Slip Opinion No. 2014-Ohio-2574.**]

*Taxation—Valuation—It is appropriate for appraisers to compare assisted-living facilities to apartment buildings in order to distinguish the property's real-property value from its business-property value—Decision affirmed.*

(No. 2013-0278—Submitted February 4, 2014—Decided June 18, 2014.)

APPEAL from the Board of Tax Appeals, Nos. 2009-Q-1547, 2009-Q-1615, and 2009-Q-1616.

———————————

**Per Curiam**.

{¶ 1} This case involves a dispute over the tax-year-2007 value of an improved 6.415-acre parcel in Cuyahoga County.  The property is located in an

area zoned as a "Senior Residence/Life Care District," and it is operating as an assisted-living facility.

{¶ 2} In tax year 2007, the county fiscal officer valued the subject property at $8,740,000, consistent with its 2004 sale price. The property's owner, appellee Health Care REIT, Inc., sought a reduction to $3,100,000, but appellee Cuyahoga County Board of Revision ("BOR") retained the fiscal officer's valuation.

{¶ 3} The owner and the appellant, Berea City School District Board of Education ("school board"), both appealed to the Board of Tax Appeals ("BTA"), where they presented competing appraisals. The owner's appraiser relied on data about apartment buildings as a starting point for valuation and opined a value of $3,100,000. By contrast, the school board's appraiser considered only data about assisted-living facilities and opined a value of $5,400,000. The BTA found the owner's appraisal more persuasive and assigned a value of $3,100,000.

{¶ 4} The school board now appeals, arguing that the BTA's decision was unlawful and unreasonable because, among other things, it relied on an appraisal that disregarded city zoning laws. For the reasons explained below, we affirm the BTA's decision.

**Facts**

*1. The subject property*

{¶ 5} The subject property, parcel No. 373-26-018, is a 6.415-acre tract of land located in the city of Middleburg Heights and in the Berea City School District. The property is located in an area zoned as a "Senior Residence/Life Care District," which was established for the housing and living-assistance needs of persons 60 years and older. Middleburg Heights Codified Ordinances 1134.01 and 1134.02. In keeping with that restriction, the parcel was improved in 1998 with a 48,648-square-foot structure that operates as an assisted-living facility, Brookside Estates.

{¶ 6} In October 2004, Health Care REIT, Inc., purchased the property for $8,740,000. The property was leased to and managed by Emeritus Corporation both before and after the 2004 sale.

*2. Board of revision proceedings*

{¶ 7} In tax year 2006, the first year of Cuyahoga County's triennium, the school board filed a complaint with the BOR, seeking an increase in property value. Health Care REIT did not file a counter-complaint. The BOR increased the property's tax value to $8,740,000 for tax year 2006, consistent with the 2004 sale price.

{¶ 8} The county fiscal officer assigned the same value for tax year 2007.[1] Health Care REIT filed a complaint requesting a reduction to $5,400,000, and it later filed an amended complaint seeking a reduction to $3,100,000. The school board filed a counter-complaint, supporting the fiscal officer's valuation.

{¶ 9} At the BOR hearing, Health Care REIT presented the testimony and report of appraiser Richard Racek Jr. Racek used the sales-comparison and income approaches to valuation, relying on data about apartment complexes as a starting point for his analysis. Ultimately, he opined a value of $3,100,000 for tax year 2007. An employee of Emeritus, Scott Marshall, also testified.

{¶ 10} In response, the school board pointed to the BOR's decision accepting the 2004 sale price as the best evidence of the property's value for tax year 2006 and presented evidence of the 2004 sale and lease to Emeritus and the property's $50,000,000 mortgage.

{¶ 11} On July 6, 2009, the BOR issued a decision retaining the fiscal officer's valuation of the property—$8,740,000.

---

[1] Each tax year and appeal stands on its own record. *Olmsted Falls Bd. of Edn. v. Cuyahoga Cty. Bd. of Revision*, 122 Ohio St.3d 134, 2009-Ohio-2461, 909 N.E.2d 597.

*3. BTA proceedings*

{¶ 12} Both parties appealed the BOR decision to the BTA and the cases were consolidated.

{¶ 13} At the BTA hearing, Health Care REIT presented a supplemented appraisal report from Racek and his testimony. Racek again used the sales-comparison and income approaches to valuation, but he supplemented his analysis with additional apartment comparables. He also developed a cost-approach analysis. As in his initial report, Racek opined a value of $3,100,000.

{¶ 14} The school board introduced testimony and an appraisal report from Charles M. Ritley. Ritley used all three valuation methods. Unlike Racek, however, he did not rely on any data about apartment complexes; Ritley used only assisted-living facilities as comparables. He also placed significant reliance on financial data about the subject property and data from the Marshall Swift Valuation Service for Homes for the Elderly. Ultimately, Ritley opined a value of $5,400,000.

{¶ 15} On January 15, 2013, the BTA issued an opinion assigning a value of $3,100,000 for the January 1, 2007 tax-lien date. The BTA rejected the October 2004 sale price as the best evidence of the property's value in tax year 2007, citing the sale's remoteness and insufficient record evidence about the circumstances of the sale. The BTA then stated that it found Racek's opinion more persuasive than Ritley's.

{¶ 16} The school board appealed to this court. Oral argument was held before a master commissioner on December 17, 2013.

**Analysis**

{¶ 17} On appeal, the school board advances five propositions of law, each arguing that the BTA's decision was unreasonable and unlawful. At oral argument before the master commissioner, the school board clarified that it is

asking this court "to reverse" the BTA "because there was not sufficient evidence to warrant a reduction" in value.

{¶ 18} Health Care REIT defends the BTA's decision and asks this court to award attorney fees because the school board's appeal is frivolous.

*1. Standard of review*

{¶ 19} "The fair market value of property for tax purposes is a question of fact, the determination of which is primarily within the province of the taxing authorities * * *." *Cuyahoga Cty. Bd. of Revision v. Fodor*, 15 Ohio St.2d 52, 239 N.E.2d 25 (1968), at syllabus. When parties present competing appraisals to the BTA, "the BTA is vested with wide discretion in determining the weight to be given to the evidence and the credibility of the witnesses that come before it." *EOP-BP Tower, L.L.C. v. Cuyahoga Cty. Bd. of Revision*, 106 Ohio St.3d 1, 2005-Ohio-3096, 829 N.E.2d 686, ¶ 9. As a result, "this court will not disturb a decision of the Board of Tax Appeals with respect to such valuation unless it affirmatively appears from the record that such decision is unreasonable or unlawful." *Fodor* at syllabus; *Hilliard City Schools Bd. of Edn. v. Franklin Cty. Bd. of Revision*, 128 Ohio St.3d 565, 2011-Ohio-2258, 949 N.E.2d 1, ¶ 19.

*2. 2004 sale price is not the best evidence of true value*

{¶ 20} In proposition of law No. IV, the school board argues that the BTA acted unreasonably and unlawfully by failing to accept the property's 2004 sale price as the best evidence of its true value for tax year 2007.[2] The school board contends that the 2004 sale is recent and that other evidence supports its position that the 2004 sale price accurately reflects the value for tax year 2007.

{¶ 21} We have long held that when determining value, "[t]he best evidence of the 'true value in money' of real property is an actual, recent sale of

---

[2] The school board did not press this claim during oral argument before the master commissioner. However, it did continue to argue that the BTA lacked sufficient evidence to reduce the county fiscal officer's valuation of $8,740,000, a figure derived from the 2004 sale price.

the property in an arm's-length transaction." *Conalco, Inc. v. Monroe Cty. Bd. of Revision*, 50 Ohio St.2d 129, 363 N.E.2d 722 (1977), at paragraph one of the syllabus; *see also Berea City School Dist. Bd. of Edn. v. Cuyahoga Cty. Bd. of Revision*, 106 Ohio St.3d 269, 2005-Ohio-4979, 834 N.E.2d 782. If there has been a recent arm's-length transaction, " 'the auditor shall consider the sale price * * * to be the true value for taxation purposes.' " *Hilliard City Schools Bd. of Edn.* at ¶ 18, quoting former R.C. 5713.03, Am.Sub.H.B. No. 260, 140 Ohio Laws, Part II, 2665, 2722.[3] A party can rebut this presumption of value only by "challenging whether the elements of recency and arm's-length character between a willing seller and a willing buyer are genuinely present for that particular sale." *Cummins Property Servs., L.L.C. v. Franklin Cty. Bd. of Revision*, 117 Ohio St.3d 516, 2008-Ohio-1473, 885 N.E.2d 222, ¶ 13.

{¶ 22} As to recency, the sale must have been within a reasonable length of time of the tax-lien date. *Id.* at ¶ 35. And this court has explained that "[t]he reasonableness of the length of time * * * encompasses all factors that would, by changing with the passage of time, affect the value of the property." *Id.* One component of recency is the period of time that has elapsed between the sale date and the tax-lien date. We have refrained from setting a limit on the amount of time that can pass between the two dates before the sale no longer qualifies as recent; the length of time a sale remains "recent" "will vary from case to case." *New Winchester Gardens, Ltd. v. Franklin Cty. Bd. of Revision*, 80 Ohio St.3d 36,

---

[3] As of September 10, 2012, R.C. 5713.03 reads:

> In determining the true value of any tract, lot, or parcel of real estate under this section, if such tract, lot, or parcel has been the subject of an arm's length sale between a willing seller and a willing buyer within a reasonable length of time, either before or after the tax lien date, the auditor *may* consider the sale price of such tract, lot, or parcel to be the true value for taxation purposes.

(Emphasis added.)

44, 684 N.E.2d 312 (1997), *overruled in part on other grounds*, *Cummins*.[4] When determining recency in a particular case, the BTA should also consider "general developments in the market between the date of sale and the tax-lien date." *Cummins* at ¶ 35.

{¶ 23} Here, the BTA's determination that the 2004 sale of the property was "too remote from the tax lien date in this matter" is reasonable because the BTA relied on affirmative evidence indicating that the sale should *not* be regarded as recent. BTA Nos. 2009-Q-1547, 2009-Q-1615, and 2009-Q-1616, 2013 WL 314191, at *2 (Jan. 15, 2013). *Compare Zell v. Hamilton Cty. Bd. of Revision*, BTA No. 94-N-27, 1996 WL 154479, at *3-5 (Mar. 29, 1996), *affirmed* 78 Ohio St.3d 330, 677 N.E.2d 1201 (1997) (determining that a sale that occurred 28 months after the tax-lien date qualified as recent based on affirmative evidence supporting that conclusion). Indeed, we have stated that a presumption, such as that of recency, " 'is a procedural device which is resorted to only in the absence of evidence by the party in whose favor a presumption would otherwise operate.' " *Cincinnati School Dist. Bd. of Edn. v. Hamilton Cty. Bd. of Revision*, 78 Ohio St.3d 325, 328, 677 N.E.2d 1197 (1997), quoting *Ayers v. Woodard*, 166 Ohio St. 138, 140 N.E.2d 401 (1957), paragraph three of the syllabus. Here the BTA considered the recency of the sale in light of evidence offered by both parties.

{¶ 24} In this case, the sale occurred in October 2004, 26 months prior to the tax-lien date, January 1, 2007. Moreover, two competing appraisals of the property's January 1, 2007 value have been completed since the beginning of the

---

[4] We have held that a sale is not presumed to be recent if it occurred more than 24 months before the tax-lien date in a reappraisal year and the reappraisal did not rely on that sale. *See Akron City School Dist. Bd. of Edn. v. Summit Cty. Bd. of Revision*, __ Ohio St.3d __, 2014-Ohio-1588, __N.E.2d __, ¶ 26-27. The *Akron Bd. of Edn.* holding does not apply here, however, because the sale occurred a mere 14 months before the reappraisal lien date, which was January 1, 2006. Moreover, that sale price was adopted as the tax-year-2006 value of the property after the filing of a complaint for that year, and the tax year at issue here is 2007.

triennium and *neither* relied on the 2004 sale price—$8,740,000—as a basis for valuing the property. Racek submitted an appraisal on the property on March 23, 2009 (and a supplemented appraisal on February 17, 2012), arriving at a valuation of $3,100,000 each time. Ritley submitted an appraisal of the property on September 4, 2012, arriving at a valuation of $5,400,000. Together, the lapse of time and the appraisals support the BTA's decision to reject the sale price as the best evidence of value.

{¶ 25} In addition, the BTA's finding is supported by record evidence of general market changes following the October 2004 sale. During the BTA hearing, the school board's own appraiser stated that the property "suffer[ed] a slump in occupancy during the beginning of the housing crash and a little bit into it." He further noted that "[i]n '07, we were in the significant beginnings of this great recession * * *." As a result, he explained, the property went "through a tough period."

{¶ 26} Finally, the BTA's decision not to rely on the 2004 sale price is also supported by the testimony of the school board's appraiser and the property's manager, both of whom informed the BTA that the sale price included real property *and* business property. This makes sense, because the sale price of an assisted-living facility may "include elements of business value that relate to the provision of ancillary services as opposed to the rental of realty." *LTC Properties, Inc. v. Licking Cty. Bd. of Revision*, 133 Ohio St.3d 111, 2012-Ohio-3930, 976 N.E.2d 852, ¶ 21.

{¶ 27} Under these circumstances, it can hardly be said that the record lacks support for the BTA's conclusion, much less that there is "a total absence of evidence" to support its findings. *HealthSouth Corp. v. Testa*, 132 Ohio St.3d 55, 2012-Ohio-1871, 969 N.E.2d 232, ¶ 14 ("we will reverse BTA findings only

when there is a total absence of evidence to support a particular finding"). Therefore, we defer to the BTA's finding that the 2004 sale was not recent.[5]

*3. Relevance of zoning in real-property valuation*

**{¶ 28}** In proposition of law No. I, the school board argues that the BTA "acted unreasonably when it accepted the valuation of an assisted-living facility based on comparisons to apartment buildings" even though city zoning did not permit use of the property as an apartment building. We disagree.

**{¶ 29}** The subject property is located in an area zoned by the city as a "Senior Residence/Life Care District." The city created this district "specifically for elderly living and care," contemplating facilities that would meet the housing and assistance needs of persons 60 years or older, "whatever level of attention they may require." Middleburg Heights Codified Ordinances 1134.01 and 1134.02. Housing in this district is limited to apartments and single-family cluster dwelling units designed specifically for the elderly, nursing-care facilities, and assisted-living facilities. *Id.* at 1134.03. Each type of housing must comply with a minimum-size-unit requirement. For example, in an assisted-living facility, every unit must be at least 250 square feet, and an apartment (with no bedroom) must be at least 500 square feet. *Id.* at 1134.07.

**{¶ 30}** The subject property is operating as an assisted-living facility. Seventy-five of its 86 units are less than 500 square feet. Accordingly, it could not be classified as an apartment building under current zoning law. Even if the building were reconfigured to satisfy the size requirements for apartments, those units could still be rented only to persons 60 years old or older. To eliminate the age restriction would require revision of city zoning laws.

---

[5] Because there is record support for the BTA's finding and the parties do not dispute who has the burden of proof regarding recency, we need not make a formal determination of which party bore that burden here.

{¶ 31} The school board argues that in light of these zoning restrictions, it was unreasonable for the BTA to rely on Racek's appraisal—which relied on comparisons to apartment buildings as a starting point for valuation. There appear to be two components to this argument.

{¶ 32} First, the school board argues that the BTA should not have relied on Racek's appraisal, because Racek mistakenly believed that the property was currently in use as an apartment building, not as an assisted-living facility. In his appraisal report, Racek did at one point refer to the property's continued use as an apartment building. However, he also clearly stated that the building was being operated as "an assisted living facility," and at the hearing, he explained that the property's "current occupant is using the property as an assisted living facility." In addition, Racek's appraisal reports indicate that "improvements on the subject property comprise a one story, assisted living facility." Thus, the BTA had a sufficient evidentiary basis for disregarding Racek's erroneous reference to the property's operation as an apartment building.

{¶ 33} Second, the school board "submits that it is unreasonable for the BTA to rely on an appraisal report and testimony from an appraiser who disregards current zoning ordinances." It is true that an appraiser cannot simply ignore zoning restrictions. Indeed, standard assessment practices and this court's case law establish that the effect of zoning on a property's market price must be taken into account for valuation purposes. *See* International Association of Assessing Officers, *Property Assessment Valuation* 11, 32, 54-59, 61-62 (2d Ed.1996); *Woda Ivy Glen Ltd. Partnership v. Fayette Cty. Bd. of Revision*, 121 Ohio St.3d 175, 2009-Ohio-762, 902 N.E.2d 984, ¶ 23.

{¶ 34} Racek did not ignore the zoning ordinances, however. Instead, he opined, as did the school board's expert, that the highest and best use of the

building was its current use—as an assisted-living facility.[6] Racek then stated that the best way to calculate the property's value was by way of comparison to apartment buildings.

**{¶ 35}** Nevertheless, the school board claims that Racek improperly disregarded zoning laws, citing two cases to support its argument. First, the school board says *Porter v. Cuyahoga Cty. Bd. of Revision*, 50 Ohio St.2d 307, 364 N.E.2d 261 (1977), requires record support for any anticipated zoning changes before they can be factored into an appraisal. In *Porter*, this court considered how to value real property when it is *not* zoned for its highest and best use. The property at issue was "zoned for less profitable uses as compared with neighboring lands zoned for more profitable uses," *id.* at 310, yet the BTA had relied on an appraisal that "treated the property in question as if it were already zoned for its highest and best use," *id.* at 312. We reversed, holding that "[i]n determining the value of property for tax assessment purposes, the taxing authority may not consider an appraisal of property in which the appraiser, believing the property to be more valuable than its permitted uses under current zoning laws indicate, values the property as if it were already zoned for its most profitable use." *Id.* at syllabus. This accords with the generally accepted principle that a highest and best use must be one that is legally permissible in order to qualify as the basis for assessing the property. *Property Assessment Valuation* at 32.

**{¶ 36}** Unlike in *Porter*, here the BTA did not rely on an appraisal that valued the property based on a different use. Racek did not state that the property

_____

[6] "Highest and best use" of a property means " ' "[t]hat reasonable and probable use that will support the highest present value" ' " as of the appraisal date. *Youngstown Sheet & Tube Co. v. Mahoning Cty. Bd. of Revision*, 66 Ohio St.2d 398, 422 N.E.2d 846 (1981), fn. 3, quoting *Encyclopedia of Real Estate Appraising* 8 (3d Ed.1978), quoting Boyce, *Real Estate Appraisal Terminology* 107 (1980). Alternatively, it is " ' "that use, from among reasonably probable and legal alternative uses, found to be physically possible, appropriately supported, financially feasible, and which results in highest land value." ' " *Id.*

would be more highly valued as an apartment building than as an assisted-living facility, and he did not disregard existing zoning restrictions to evaluate the property for a use not presently permitted by law. Indeed, Racek and Ritley *agreed* that the highest and best use of this property was its current use—as an assisted-living facility. To the extent Racek relied on data about apartment buildings, it was *not* for the purpose of showing that this property's highest and best use would be as an apartment building. Instead, as discussed below, he relied on information about apartment buildings as a way to isolate the property's real estate value from its business value. Accordingly, the BTA's decision to credit Racek's appraisal does not implicate *Porter* problems.

{¶ 37} The school board also quotes *Park Place Properties, L.L.C. v. Miami Cty. Bd. of Revision*, 2d Dist. Miami No. 2001-CA-35, 2002 WL 242707, *11 (Feb. 15, 2002), for the proposition that evidence of value for a use prohibited by ordinance may be considered only when there is evidence showing that the ordinance is likely to be changed in the near future. As in *Porter*, the appraiser in *Park Place* found that the highest and best use of the property was warehousing, even though the property's current zoning did not permit that use. *Id.* at *9. The trial court's determination of value reflected the possibility that the property would be used for warehousing. However, the court of appeals rejected that valuation because "no evidence [had been] presented to support the reasonable probability of a zoning change in the near future." *Id.* at *11.

{¶ 38} The facts here differ from those in *Porter* and *Park Place* because both appraisers agree that the property's highest and best use is as an assisted-living facility, a use permitted by existing zoning laws. Their dispute is about how to best calculate the property's value for that use. Accordingly, current zoning restrictions did not require the BTA to discount Racek's appraisal. We therefore reject the school board's first proposition of law.

*4. BTA's decision to accept Racek's appraisal over Ritley's*

*was not unreasonable or unlawful*

**{¶ 39}** In proposition of law Nos. II and III, the school board argues that the BTA acted unreasonably and unlawfully by accepting a valuation for an assisted-living facility that relied on comparisons to apartment buildings (Racek's appraisal) and rejecting a valuation that compared the assisted-living facility to other assisted-living facilities (Ritley's appraisal). Throughout these arguments, the school board levies additional criticisms of Racek's appraisal and argues that Ritley's appraisal is superior.

a. Appraisals of assisted-living facilities

**{¶ 40}** "[I]n the absence of a current sale of property, true value in money may be determined by appraisal, utilizing the market approach to value [sales-comparison approach], the income approach or the cost approach." *Springfield Local Bd. of Ed. v. Summit Cty. Bd. of Revision*, 68 Ohio St.3d 493, 494, 628 N.E.2d 1365 (1994); *see* Ohio Adm.Code 5703-25-07. The school board argues that under any of these three approaches, an appraiser may not rely on comparisons to apartment buildings when valuing an assisted-living facility.

**{¶ 41}** We have squarely rejected the school board's argument in earlier decisions. *See LTC Properties*, 133 Ohio St.3d 111, 2012-Ohio-3930, 976 N.E.2d 852, at ¶ 21; *see also Dublin Senior Community Ltd. Partnership v. Franklin Cty. Bd. of Revision*, 80 Ohio St.3d 455, 460, 687 N.E.2d 426 (1997) (explaining the importance of deleting business income and expenses, which "may distort the valuation of the real estate"). "[I]n order to properly value [an assisted-living facility], business operations must be separated from the real property." *Harbor Court Ltd. Partnership v. Cuyahoga Cty. Bd. of Revision*, BTA No. 92-T-1054, at 17 (June 10, 1994). The valuation of the realty portion of congregate-care facilities by comparison to conventional apartment buildings has been common practice for over 20 years. *See Chippewa Place Dev. Co. v. Cuyahoga Cty. Bd. of*

*Revision*, BTA No. 91-P-245, 1993 WL 384198 (Sept. 24, 1993).[7] As recently as 2012, we confirmed that it is appropriate for appraisers to compare assisted-living facilities to apartment buildings in order to distinguish the property's real-property value from its business-property value. *LTC Properties* at ¶ 21.

{¶ 42} *LTC Properties* then articulated the rationale for comparing assisted-living facilities to apartment buildings. Two considerations "militate toward using apartment buildings as a point of comparison when valuing the real property of a congregate-care facility under the sales-comparison or income-capitalization approaches." *Id*. First, "the sale price of a congregate-care facility may include elements of business value that relate to the provision of ancillary services as opposed to the rental of realty." *Id*.; *see also Dublin Senior Community* at 460 ("a congregate care center * * * comprises a combination of real estate and business activities," such as food and housekeeping). Second, "the income of a congregate-care facility must be analyzed into its rental and service-fee components in order to determine that portion of income that relates to realty." *LTC Properties* at ¶ 21.

{¶ 43} The same concerns do not apply in the context of the cost approach to valuation. *Id*. ¶ 19-22. When using this approach, an appraiser may choose to rely on apartment-building cost schedules as the starting point for comparison to an assisted-living facility. However, as we have expressly recognized, an appraiser may also choose to rely on cost schedules for nursing homes, rather than apartment buildings, as the initial point of comparison. *Id*., ¶ 20-24.

{¶ 44} In short, an appraiser may rely on apartment comparables when valuing an assisted-living facility. We therefore reject the school board's claim

---

[7] The school board contends that the holding of *Chippewa Place*, permitting comparison of a congregate-care facility to traditional apartments, does not extend to assisted-living facilities, because the former allow for more independent living than the latter. This court did not distinguish between these types of facilities in *LTC Properties*, however.

that the BTA improperly relied on Racek's appraisal because "[a]partment buildings are not comparable to assisted living facilities."

b. The BTA's decision in *Elm St.* is not determinative of this case

**{¶ 45}** The school board also argues that we must reverse the BTA's decision because it contradicts the BTA's prior holding in *Elm St., Inc. v. Cuyahoga Cty. Bd. of Revision*, BTA No. 2008-A-1095, 2011 WL 2446195 (June 14, 2011).

**{¶ 46}** In *Elm St.*, a property owner challenged the Cuyahoga County Board of Revision's valuation of an assisted-living facility at $3,393,500. The property owner sought a reduction to $2,150,000. In support, it presented Racek's opinion of value, which the BTA rejected.

**{¶ 47}** In rejecting Racek's appraisal, the BTA critiqued his use of apartment comparables to value the *Elm St.* property. The BTA initially acknowledged that in determining the real-property valuation of congregate-care facilities, it had routinely relied upon appraisal information utilizing a comparison to conventional apartment buildings since its decision in *Chippewa Place*. *Elm St.* at *5. However, the BTA then found that the apartment comparables selected by Racek were "significantly dissimilar to the subject [property]." *Id.* (citing differences in the size and number of units, amenities, etc.). The BTA explained that "adjustments could have been made to account for the aforementioned drastic differences" but that it was unclear from the record whether Racek had made the necessary adjustments. *Id.* at *6. The BTA also questioned Racek's valuation because he had used the same rent rate to calculate the property's entire square footage, including common areas. *Id.* Ultimately, the BTA concluded that Racek's resulting valuation was unreliable.

**{¶ 48}** The school board now contends that because the BTA rejected Racek's appraisal in *Elm St.*, stare decisis required the BTA to also reject Racek's appraisal in this case. The subject properties in *Elm St.* and this case are located

near each other and have similar features. And Racek's appraisals of the two properties have many similarities: his sales-approach valuation in this appraisal used the same four apartment comparables from the *Elm St.* appraisal (but included four additional comparables); he relied on the same expense information and comparable sales to establish a capitalization rate in both appraisals; he used the same cost method and depreciation rate in both appraisals; and he applied the same methodology for determining a depreciation rate in the cost approach for both properties.

{¶ 49} In spite of these similarities, *Elm St.* does not mandate any particular outcome in this case. We have firmly rejected arguments that the BTA must act consistently when evaluating evidence of value, even when the evidence goes to value of the *same* property in different tax years. *See Olmstead Falls Bd. of Edn. v. Cuyahoga Cty. Bd. of Revision*, 122 Ohio St.3d 134, 2009-Ohio-2461, 909 N.E.2d 597, ¶ 24-25. Although "consistency in the manner of evaluating evidence is desirable," "the concern for consistency is overridden by the imperative that the BTA correctly determine value in the case before it." *Id.* at ¶ 25.

{¶ 50} Here, nothing in the record indicates that the BTA was unreasonable in finding Racek's valuation more credible than Ritley's *in this case*. The BTA's identification of certain problems with Racek's analysis in *Elm St.* arguably does highlight flaws in Racek's present appraisal. But the BTA did not cite the same problems with Racek's adjustments in this case that it identified in *Elm St.* Accordingly, we cannot conclude that *Elm St.* required the BTA to reach a different outcome here.

c. The BTA's decision to rely on Racek's appraisal is supported by the record

{¶ 51} Throughout proposition of law Nos. II and III, the school board suggests a variety of other reasons why this court should conclude that Ritley's

appraisal is more persuasive than Racek's. In essence, these arguments invite this court to disregard the deference we owe to the BTA.

{¶ 52} We have long recognized the BTA's "wide discretion to determine the weight given to evidence and the credibility of witnesses before it" when making a decision about the valuation of property. *Meijer, Inc. v. Montgomery Cty. Bd. of Revision*, 75 Ohio St.3d 181, 185, 661 N.E.2d 1056 (1996). The BTA "is not required to adopt the appraisal methodology espoused by any expert or witness" in arriving at a valuation. *Hotel Statler v. Cuyahoga Cty. Bd. of Revision*, 79 Ohio St.3d 299, 303, 681 N.E.2d 425 (1997).

{¶ 53} When we review a determination of valuation by the BTA, we do not reevaluate the evidence considered by the BTA or "substitute [our] judgment on factual issues for that of the Board of Tax Appeals." *Citizens Fin. Corp. v. Porterfield*, 25 Ohio St.2d 53, 57, 266 N.E.2d 828 (1971). Instead, we must defer to the BTA's decision as long as it is lawful and supported by the record. *See Throckmorton v. Hamilton Cty. Bd. of Revision*, 75 Ohio St.3d 227, 229, 661 N.E.2d 1095 (1996). Here, the school board is unable to overcome that heavy measure of deference.

*i. Racek's sales-comparison approach*

{¶ 54} The school board argues that the BTA erroneously credited Racek's valuation because his sales-comparison analysis relied on data from eight apartment complexes that are not comparable to the property.

{¶ 55} As explained above, it is permissible—indeed, preferable—for an appraiser to rely on apartment comparables as a starting point for valuing an assisted-living facility under the sales-comparison approach. *LTC Properties*, 133 Ohio St.3d 111, 2012-Ohio-3930, 976 N.E.2d 852, at ¶ 21. Here, the BTA concluded that the comparables used in Racek's appraisal supported his valuation.

{¶ 56} The school board contends otherwise, citing significant differences between Racek's comparables and the subject property, including differences in

overall square footage, unit square footage, value, amenities, and age. But the BTA was aware of these differences and reasonably concluded that Racek had made adequate "adjustments to each of the sale and rent comparables used to account for the differences in amenities and size of the units." 2013 WL 314191 at *4. In addition, the BTA specifically noted that Racek "considered the 'relatively small size and number of residential units' within the subject property, 'as well as the significant amount of common areas' in estimating operating expenses." *Id.*, quoting Racek's appraisal report.

{¶ 57} The school board also claims that Racek's appraisal lacks credibility because Racek did not adjust his final valuation after adding three comparables in his supplemented report. In his initial report, presented to the BOR, Racek considered five apartment-complex comparables. After the BTA issued its decision in *Elm St.*, 2011 WL 2446195, Racek supplemented his report to include three additional apartment-complex comparables (and two additional rent comparables in his income-approach analysis). The new comparables had a lower value than the original comparables. But in spite of that lower value, Racek's opinion of value remained the same: $3,100,000.

{¶ 58} Racek's unchanged valuation is somewhat perplexing, but even so, the school board cannot meet the heavy burden of proving that the BTA acted unreasonably by accepting Racek's appraisal over Ritley's. The BTA explained that Racek's valuation was more persuasive than Ritley's because even though Ritley used assisted-living-facility sales comparables, he did not adequately distinguish the business components from real-property components in the sale prices. 2013 WL 314191 at *4. Indeed, the BTA quoted Ritley's own appraisal report, which states, "[I]t was * * * difficult to understand what is included in the sale price relative to the large business value component of many sales" when using assisted-living-facility comparables. *Id.* Ritley also acknowledged that his

comparables offered different levels and types of service than the subject property.

{¶ 59} Under the circumstances, the BTA reasonably concluded that "Racek's opinion of value [was] more persuasive"; his appraisal did not conflate the value associated with business components with real-property value. *Id.*

*ii. Racek's income approach*

{¶ 60} The school board also argues that the BTA erred by crediting Racek's valuation because his "income approach is not a good indicator of value." According to the school board, Racek treated the subject property as an apartment complex without making adjustments for the property's resident-age restriction or the income and expenses specific to elder-care properties.

{¶ 61} As explained above, Racek permissibly relied on apartment-building rent comparables as a starting point for his income-approach analysis. *LTC Properties*, 133 Ohio St.3d 111, 2012-Ohio-3930, 976 N.E.2d 852, at ¶ 21. Moreover, the BTA reasonably concluded that Racek had made adjustments to account for differences in amenities and size. 2013 WL 314191 at *4. He considered the relatively small size and number of residential units in the subject property, as well as the significant amount of common areas, when estimating operating expenses. *Id*.

{¶ 62} The BTA found that Racek's valuation was more credible than Ritley's because, as with his sales comparables, Ritley's rent comparables reflected the income value of both real property and services. In addition, Ritley acknowledged that his comparables offered different levels and types of service. Yet even so, Ritley "simply compared the subject's actual 2012 rental rates to the rents charged by the comparables." *Id.*

{¶ 63} Under the circumstances, it was reasonable for the BTA to assign greater weight to Racek's valuation.

*iii. Racek's cost approach*

**{¶ 64}** Finally, the school board argues that the BTA erred by relying on Racek's valuation under the cost approach because he used Marshall Swift Valuation Service's information about apartments rather than that service's information about homes for the elderly to determine total replacement cost and depreciation for the building on the property. The school board claims that Ritley's cost valuation is more credible because he used the Marshall Swift Valuation Service for Homes for the Elderly.

**{¶ 65}** As with its other critiques of Racek's appraisal, the school board's objections to Racek's cost analysis are rooted in his reliance on information about apartment buildings. But as explained above, *LTC Properties* permits an appraiser to rely on cost schedules for either apartment buildings or assisted-living facilities as the starting point for analysis under the cost approach. Accordingly, the BTA did not err by failing to reject Racek's appraisal for this reason. Indeed, this is a quintessential fact-finding determination, to which we must defer.

*iv. Conclusion regarding proposition of law Nos. I and II*

**{¶ 66}** In short, the school board did not show that the BTA's acceptance of Racek's valuation was unlawful or unreasonable. Our role does not include reevaluating the evidence considered by the BTA. And because the record supports the BTA's decision, we reject the school board's second and third propositions of law.

*5. Clarity of the BTA decision*

**{¶ 67}** In proposition of law No. V, the school board argues that the BTA's decision is unreasonable and unlawful because it does not set forth findings, state what evidence the BTA deemed relevant to determine value, or explain why the BTA rejected other evidence.

20

**{¶ 68}** We have expressly held that the BTA is *not* required to set forth formal findings of fact and conclusions of law. *See Wolf v. Cuyahoga Cty. Bd. of Revision*, 11 Ohio St.3d 205, 206, 465 N.E.2d 50 (1984). However, the BTA does have "the duty to state what evidence it considered relevant in reaching its determination." *HealthSouth Corp. v. Levin*, 121 Ohio St.3d 282, 2009-Ohio-584, 903 N.E.2d 1179, ¶ 34.

**{¶ 69}** As a practical matter, it can be impossible for this court to perform its appellate duty if a BTA decision fails to state what evidence it considered relevant in reaching its value determinations. For example, in *Howard v. Cuyahoga Cty. Bd. of Revision*, 37 Ohio St.3d 195, 524 N.E.2d 887 (1988), the BTA heard evidence of three possible property values. The BTA set the value at a figure that no one had advocated and offered no explanation of how it reached that figure. We were unable to review the BTA's decision to determine whether it was unlawful or unreasonable because the BTA had not explained its reasoning. Similarly, in *Gen. Motors Corp. v. Cuyahoga Cty. Bd. of Revision*, 53 Ohio St.3d 233, 559 N.E.2d 1328 (1990), we remanded to the BTA to specify reasons for its determination. We reiterated that "[w]e can perform our duty to affirm reasonable, and to reverse unreasonable, determinations only when the BTA sets forth its findings and the basis therefore." *Id.* at 235.

**{¶ 70}** Despite the school board's protestations, here the BTA did set forth the basis for its decision: "we find Mr. Racek's opinion of value more persuasive." 2013 WL 314191 at *4. As a result, the BTA found the value of the subject property as of January 1, 2007, to be $3,100,000. *Id.* The BTA could have explained additional aspects of its reasoning, but its failure to do so does not necessitate reversal. The record is clear as to which evidence the BTA found more persuasive, so we are able review the BTA's decision without remanding for additional explanation.

**{¶ 71}** We therefore reject the school board's fifth proposition of law.

*6. Attorney fees*

**{¶ 72}** Finally, Health Care REIT asks this court to award attorney fees because the school board's appeal is frivolous. According to Health Care REIT, the school board's appeal "is not reasonably well-grounded in fact or warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law." *See* S.Ct.Prac.R. 4.03 (setting forth when an appeal is considered frivolous).

**{¶ 73}** This court has awarded attorney fees under the frivolous-appeal rule under limited circumstances. For example, we ordered sanctions against an appellant in a frivolous appeal when he had a history of filing similar frivolous actions. *State ex rel. Howard v. Doneghy*, 102 Ohio St.3d 355, 2004-Ohio-3207, 810 N.E.2d 958, ¶ 10-11. Sanctions are also appropriate when a party files an action for no reason other than harassment. *State ex rel. Grendell v. Davidson*, 86 Ohio St.3d 629, 716 N.E.2d 704 (1999).

**{¶ 74}** This is not the sort of action that warrants an award of attorney fees. As the school board notes, there is an appeal as of right from decisions of the BTA to this court. *See* R.C. 5717.04. In the past, we have been willing to reverse the BTA's findings upon finding that they lack evidentiary support in the record. *See, e.g., Cincinnati School Dist. Bd. of Edn. v. Hamilton Cty. Bd. of Revision*, 127 Ohio St.3d 63, 2010-Ohio-4907, 936 N.E.2d 489, ¶ 24, 35. Here, the school board's objections to Racek's appraisal provided a reasonable basis for arguing that the BTA's findings lacked evidentiary support. In addition, the school board also identified a possible conflict between the BTA's decisions in this case and in *Elm St.*, 2011 WL 2446195. Accordingly, there was a reasonable basis for the school board to advocate reversal in this case.

**{¶ 75}** For these reasons, we decline to award attorney fees under S.Ct.Prac.R. 4.03.

**Conclusion**

{¶ 76} For the foregoing reasons, we affirm the BTA's decision and deny Health Care REIT's request for sanctions.

Judgment accordingly.

PFEIFER, O'DONNELL, and KENNEDY, JJ., concur.

FRENCH, J., concurs in judgment only.

O'CONNOR, C.J., and LANZINGER and O'NEILL, JJ., dissent.

_____

**O'NEILL, J., dissenting**.

{¶ 77} I respectfully dissent from the decision to affirm the BTA's determination of real-property value in this case. The BTA, and now the majority, have essentially decided that the value of an assisted-living facility is better determined by comparison to apartment buildings than by comparison to other assisted-living facilities. I cannot stand behind that logic, even under a posture of deference to the BTA.

{¶ 78} The subject property is located in an area zoned "Senior Residence/Life Care District," which is intended to meet the housing and assistance needs of persons 60 years or older. An assisted-living facility, Brookside Estates, was constructed on the parcel in 1998. The facility includes fewer than 100 units, the vast majority of which are 254-square-foot studios. The building includes four lounges, a commercial kitchen, a dining room, a craft room, a television room, and a small beauty shop. Bathrooms are handicapped accessible, hallways are wide enough to allow for the passage of wheelchairs and medical carts, and the front driveway is curved to allow easy access for emergency vehicles.

{¶ 79} In short, this is an assisted-living facility; it is *not* an apartment building. Indeed, as the school board's appraiser testified before the BTA, "[i]t

23

would take a massive amount of reconfiguration" to operate this property as an apartment building.

{¶ 80} This basic distinction between an assisted-living facility and an apartment building compels me to conclude that the BTA acted unreasonably when it determined this property's value by reference to data about apartment buildings. As the majority explains, two appraisals were presented to the BTA. The property owner's appraiser relied exclusively on data about apartment buildings and opined a value of $3,100,000. By contrast, the school board's appraiser considered only data about assisted-living facilities and arrived at a value of $5,400,000. Both appraisals assigned a value significantly lower than the property's most recent sale price, $8,740,000. It was an assisted-living facility then, and it is an assisted-living facility now. To value it based upon a deteriorating apartment market is disingenuous. To follow the logic of the majority and the BTA, why not bring in comparables from abandoned car dealerships and factories of similar square footage? Surely that would bring the tax value even lower.

{¶ 81} For reasons I find unpersuasive, the BTA decided to credit the owner's appraisal. The BTA essentially found that data about apartment buildings was better evidence of an assisted-living facility's value than data about other assisted-living facilities. In doing so, the BTA concluded that the property had lost $5,640,000 in value since its 2004 sale, just 27 months earlier. There is simply no evidence in this record to support such a conclusion. Has the population of senior citizens dropped so precipitously that the owners would sell this asset for a $5.6 million loss a little over two years after purchasing it? This result is clearly unreasonable, and thus I cannot defer.

{¶ 82} I recognize that in the past, the BTA and this court have permitted comparisons to apartment buildings as a starting point for determining the value of an assisted-living facility. *See, e.g., LTC Properties, Inc. v. Licking Cty. Bd. of*

*Revision*, 133 Ohio St.3d 111, 2012-Ohio-3930, 976 N.E.2d 852, ¶ 21; *Dublin Senior Community Ltd. Partnership v. Franklin Cty. Bd. of Revision*, 80 Ohio St.3d 455, 460, 687 N.E.2d 426 (1997). Admittedly, relying on apartment comparables can facilitate the distinction between the real-property value of an assisted-living facility and its business value. *See Harbor Court Ltd. Partnership v. Cuyahoga Cty. Bd. of Revision*, BTA No. 92-T-1054, 1994 WL 269639, *7-8 (June 10, 1994). But that does not mean that conventional apartment complexes make the best comparable properties in all cases. *Id*. at *11.

{¶ 83} Moreover, we have not previously been squarely presented with the question whether the BTA can reasonably conclude that an appraisal based on apartment comparables is the best evidence of an assisted-living facility's value even when it is simultaneously presented with a credible appraisal based on assisted-living-facility comparables. For the reasons explained above, I would now hold that it cannot.

{¶ 84} Accordingly, I would reverse the BTA and would find the property's value to be $5,400,000, which is the value reached by the appraisal that relied on data about other assisted-living facilities to determine the value of this assisted-living facility.

O'CONNOR, C.J., and LANZINGER, J., concur in the foregoing opinion.

————————————

Sleggs, Danzinger & Gill Co., L.P.A., and Todd W. Sleggs, for appellee Health Care REIT, Inc.

Kadish, Hinkel & Weibel, Kevin M. Hinkel, and Rita M. Jarrett, for appellant.

————————————